v.

CAPITOL SQUARE REVIEW AND ADVISORY BOARD, et al., Defendants.

No. C2–97–863.

United States District Court, S.D. Ohio, Eastern Division.

Sept. 1, 1998.

Mark B. Cohn, Trial Attorney, Cooperating Attorney, ACLU of Ohio Foundation, Inc., Cleveland, OH, Thomas D. Buckley, Jr., (Pro Hac Vice), Trial Attorney, Cooperating Attorney, ACLU of Ohio Foundation, Inc., Cleveland, OH, Joan M. Englund, Trial Attorney, Trial Attorney, Legal Director, ACLU of Ohio Foundation, Inc., Cleveland, OH, Scott T. Greenwood, Trial Attorney, Cooperating Attorney, ACLU of Ohio Foundation, Inc., Cincinnati, OH, for Plaintiffs; David Goldberger, Cooperating Attorney, ACLU of Ohio Foundation, Inc., Columbus, OH, Louis A. Jacobs, Cooperating Attorney, ACLU of Ohio Foundation, Inc., Upper Arlington, OH, of counsel.

Betty D. Montgomery, Atty. Gen. of Ohio, Michael Renner, Chief Counsel, Jeffrey S. Sutton, State Solicitor, David M. Gormley, Arthur J. Marziale, Jr., Asst. Attys. Gen., Office of Ohio Atty. Gen., Columbus, OH, John G. Stepanovich, Chesapeake, VA, (Attorney for Amicus Curiae American Center for Law and Justice), for Defendants.

### OPINION AND ORDER

GRAHAM, District Judge.

The issue presented in this case is whether the official motto of the state of Ohio "With God All Things Are Possible" is an endorsement of religion forbidden by the Establishment Clause of the First Amendment of the United States Constitution.[1] The plaintiffs are the American Civil Liberties Union of Ohio, Inc., and Matthew Peterson, a Presbyterian minister. The defendants include the Capitol Square Review and Advisory Board ("Board"); Ronald T. Keller, Executive Director of the Board; Daniel Shellanbarger, Assistant Director of the Board; and Richard H. Finan, an Ohio State Senator, who is Chairperson of the Board. Also named as defendants are the Governor of the State of Ohio, George Voinovich; the Secretary of State, Bob Taft; and the Commissioner of the Ohio Department of Taxation, Roger W. Tracy.

Capitol Square is a ten-acre site in the center of Columbus, Ohio where the Ohio state capitol building, or "statehouse", is located. The Board is charged by law with the duty of regulating all uses of Capitol Square and is vested with the authority to approve all improvements and additions to the statehouse and the statehouse grounds. Ohio Rev.Code § 105.41.

The governor is vested by law with the authority to approve all uses of the official seal of the state of Ohio. See Ohio Rev.Code § 5.10. Plaintiffs allege that Governor Voinovich approved the use of the motto in conjunction with the seal pursuant to the authority vested in him and that he originated the idea of displaying the motto at the statehouse. Secretary of State Taft and Tax Commissioner Tracy allegedly display the motto on official stationery and forms used in their official functions.

On October 1, 1959, the General Assembly of the state of Ohio enacted legislation declaring that the phrase "With God, All Things Are Possible" shall be the state's official motto.[2] There is no official legislative

---

1. For the second time, Capitol Square, the location of Ohio's state capitol building, presents this Court with important issues arising under the Establishment Clause of the First Amendment of the Constitution of the United States. In Pinette v. Capitol Square Review and Advisory Bd., 844 F.Supp. 1182 (S.D.Ohio 1993), aff'd, 30 F.3d 675 (6th Cir.1994), aff'd, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), counsel retained by the American Civil Liberties Union ("ACLU") asked the Court to force the state to permit the Ku Klux Klan to display a Latin cross on Capitol

Square during the Christmas season. Now, somewhat ironically, the ACLU, as plaintiff, asks the Court to prohibit the state from displaying the state motto "With God All Things Are Possible" together with the state seal on the Capitol Square Plaza.

2. See Ohio Rev.Code § 5.06. The statute appears in a chapter of the Ohio Revised Code entitled "State Insignia; Seals; Holidays." Included in this chapter are statutes prescribing the design of the official state flag and state seal, as well as

history of the statute which adopted the motto, but contemporary documents and newspaper accounts indicate it was suggested by a twelve-year-old Cincinnati boy, James Mastronardo, who made several trips to Columbus to speak to the Ohio General Assembly on behalf of his proposal. Ohio's then secretary of state, Ted W. Brown, undoubtedly recognizing a chance for some excellent publicity, "legitimized" James's efforts to influence the legislators by registering him as a lobbyist and later by presenting him with a special citation after the statute had been passed and signed by the governor. A press release issued at that time by Secretary of State Brown indicates that in 1865, the General Assembly adopted the motto "Imperium in Imperio" but repealed it two years later on the ground that it "smacked too much of royalty." Affidavit of Ronald T. Keller In Support of Defendants' Memorandum of Law, Attachment One. Brown's press release also states that young James "chose a verse in the New Testament, Matthew 19:26, . . . from which to draw the official motto." *Id.*

Shortly after the motto was officially adopted, Secretary of State Brown created a distinctive design by inscribing the motto on a ribbon-like device and combining it with the state seal, which he then used on his letterhead and other official documents. His successors have followed suit and certain other state officials, including the tax commissioner, have done likewise.

The state seal is a circular device which contains no religious symbols. In the foreground of the seal are a sheaf of wheat and a sheaf of arrows. In the background are mountains and a rising sun; between the background and foreground are a river and cultivated fields. *See* Ohio Rev.Code § 5.04. In May 1996, after returning from a trip to India where he saw the motto "Government Work Is God's Work" inscribed on a public building, Governor Voinovich recommended to the Board that the state motto be in-

scribed above the main entrance to the statehouse. In November, 1996, the Board adopted a modified version of the governor's recommendation and decided to engrave the state seal and motto on a granite plaza at the west entrance of the statehouse. The state seal and ribbon-like device bearing the motto, which the state proposes to install at the Capitol Square Plaza, will be made of bronze and embedded in a granite pavement at ground level. The combined display will be ten feet, nine inches by twelve feet, four inches. The letters of the motto will be six to eight inches in height.

Plaintiffs seek a declaratory judgment declaring the motto unconstitutional, and they request a permanent injunction enjoining the defendants from displaying the motto on the Capitol Square Plaza and from using it in any official way in the future.

## I.

■ Citing *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 608–609, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("we have expressly required 'strict scrutiny' of practices suggesting 'a denominational preference' ") plaintiffs assert that Ohio's motto endorses the Christian religion over other religions and must be invalidated unless it is justified by a compelling government interest. *See Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Plaintiffs assert that the motto is sectarian because it is taken from the Christian New Testament, specifically, from a saying attributed to Jesus. The Court finds this argument unpersuasive.

While the words of the motto appear to have been taken from the Christian New Testament, specifically Matthew 19:26, they are only part of a sentence in that passage and they have been completely removed from the context in which they were used.[3]

statutes designating a state flower, a state bird, a state tree and a state song.

**3.** Matthew 19:16–26 recounts a dialogue, in the presence of Jesus's disciples, between Jesus and a rich young man. The dialogue begins with the young man's question: "Good Teacher, what

shall I do to inherit eternal life?" After the young man declared that he knew and kept the commandments, he asked Jesus "What am I still lacking?" The text continues:

> 21 Jesus said to him, "If you wish to be complete, go and sell your possessions and

Removed from their Christian New Testament context, the words of the motto do not suggest a denominational preference. They do not state a principle unique to Christianity. They could be classified as generically theistic. They are certainly compatible with all three of the world's major monotheistic religions: Judaism, Christianity, and Islam. Statements similar to the words of the motto are found in the Hebrew Bible [4] as well as the Qur'an,[5] the sacred book of the Muslims.

The Golden Rule, "Do Unto Others As You Would Have Them Do Unto You," is also a saying attributed to Jesus in the Christian New Testament.[6] Many aphorisms which are part of our common vocabulary have their origin in the Hebrew Bible or the Christian New Testament. The national motto, "In God we trust," 36 U.S.C. § 186, appears to have been inspired by a passage in the Hebrew Bible.[7] None of these expressions are regarded as sectarian, nor should the motto here under consideration.

Plaintiffs have presented no evidence that a reasonable person who reads the words of the motto would recognize them as the words of Jesus or understand them as suggesting a denominational preference. Plaintiffs' witness, Rabbi Harold Berman, of Columbus, Ohio, senior Rabbi of the Congregation Tefereth Israel for eighteen years, did not recognize the source of the motto when he first became familiar with it. He was only able to say that it "sounded vaguely familiar." Defendants' witness, Dr. David Belcastro, an associate professor of religious studies at Capital University in Columbus, Ohio, opined that the average college student would not know the source of the motto. The Court concludes that an objective and reasonably informed observer would not perceive the motto as sectarian.

In some of its usages of the motto, the state has included a citation to the New Testament text, "Matt. 19:26." However, the statute which established the motto does not contain this reference, nor does the state intend to include it with the words to be inscribed on the Capitol Square Plaza.

This case is unlike *County of Allegheny*, in which the sectarian nature of the phrase "Glory to God in the Highest" [8] was manifested by its context, namely the display of a creche depicting the birth of Jesus. *See* 492 U.S. at 580, 109 S.Ct. 3086. In the instant case, the words of the motto will be displayed in the secular context of the state seal, a completely secular device.

## II.

■ Plaintiffs further argue that even if the motto is not sectarian, it nevertheless constitutes a governmental preference of religion over nonreligion which violates the Establishment Clause. The Supreme Court has said in other contexts that the Establishment Clause does not permit official preference of religion over nonreligion. *See Texas Month-*

give to the poor, and you shall have treasure in heaven; and come, follow Me."

22  But when the young man heard this statement, he went away grieved; for he was one who owned much property.

23  And Jesus said to His disciples, "Truly I say to you, it is hard for a rich man to enter the kingdom of heaven."

24  "And again I say to you, it is easier for a camel to go through the eye of a needle, than for a rich man to enter the kingdom of God."

25  And when the disciples heard this, they were very astonished and said, "Then who can be saved?"

26  And looking upon them Jesus said to them, "With men this is impossible, but with God all things are possible."

NEW AMERICAN STANDARD BIBLE 983 (The Lockman Foundation ed., 1977).

4.  Genesis 18:14: "Is anything too hard for the Lord?"; Job 42:2: "I know that thou canst do everything"; Jeremiah 32:17: "Ah, Lord God! Behold, Thou hast made the heavens and the earth by Thy great power and by Thine outstretched arm! Nothing is too difficult for Thee."

5.  See Sura 2:148: "Wheresoever ye are, God will bring you Together. For God Hath power over all things." ABDULLAH YUSEF ALI, THE HOLY QUR-AN (1978).

6.  See Luke 6:31: "And just as you want people to treat you, treat them in the same way."

7.  See Psalms 56:11: "In God I have put my trust."

8.  In *County of Allegheny*, the Latin phrase "Gloria in Excelsis Deo" was inscribed on a banner born by an angel situated at the crest of the manger. *See* 492 U.S. at 580, 109 S.Ct. 3086.

*ly, Inc. v. Bullock,* 489 U.S. 1, 8, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989); *Wallace v. Jaffree,* 472 U.S. 38, 41 n. 37, 53, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).[9] The Court has also held, however, that certain forms of official acknowledgment of religion which are regarded as part of the "fabric of our society" are permitted by the Constitution. *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). This case is governed by that rule.

■ In *Marsh,* the Court upheld the practice of the Nebraska legislature to begin each of its sessions with a prayer offered by a chaplain chosen by the executive board of the legislative council and paid out of public funds. The Court noted that:

> The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.

463 U.S. at 786, 103 S.Ct. 3330. The Court further noted that one of the first actions of the original Congress, the same Congress which drafted the Establishment Clause, was the selection of chaplains for both houses who were paid out of the public treasury; that this practice has continued uninterrupted to the present time and has been followed consistently in most of the states. *See Marsh,* 463 U.S. at 787–790, 103 S.Ct. 3330. Chief Justice Burger, speaking for the Court, said:

> Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns. In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent.

*Marsh,* 463 U.S. at 790, 103 S.Ct. 3330. The Chief Justice went on to state:

> To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Marsh,* 463 U.S. at 790, 103 S.Ct. 3330.

Like the practice of opening legislative sessions with prayers, official mottoes, oaths, and inscriptions which acknowledge the religious heritage of our nation are also deeply embedded in the history and tradition of this country. Thus, the Court in *School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203, 213, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), referring to that tradition, said:

> This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, "So help me God."

Every justice or judge of the United States is required by law to take an oath to faithfully and impartially discharge the duties of the office "So help me God." 28 U.S.C. § 453.

Justice Stewart noted in *Engel v. Vitale,* 370 U.S. 421, 446, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962):

> At the opening of each day's Session of this Court, we stand, while one of our officials invokes the protection of God. Since the days of John Marshall our Crier has said, "God save the United States and this Honorable Court."

In *Lynch v. Donnelly,* 465 U.S. 668, 674–675, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Chief Justice Burger, writing for the Court, said:

> There is an unbroken history of official acknowledgment by all three branches of

**9.** *But see: Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 400, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993):

> What a strange notion, that a Constitution which itself gives "religion in general" preferential treatment (I refer to the Free Exercise Clause) forbids endorsement of religion in general.

(Scalia, J. concurring). See also Justice O'Connor's similar comment about the Free Exercise Clause in *Wallace,* 472 U.S. at 82–83, 105 S.Ct. 2479 (" "A" government that confers a benefit on an explicitly religious basis is not neutral toward religion.").

government of the role of religion in American life from at least 1789....

Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders.

The Chief Justice noted, "The day after the First Amendment was proposed, Congress urged President Washington to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God.'" *Lynch,* 465 U.S. at 675 n. 2, 104 S.Ct. 1355 (Citation omitted). Almost all presidents since Washington have issued thanksgiving proclamations specifically invoking the deity. *Id.*

In *Lynch* and in other cases, the Court has made specific reference to the national motto, "In God We Trust" and the language "One Nation Under God," which is part of the Pledge of Allegiance to the American flag. *See County of Allegheny,* 492 U.S. at 602–603, 625, 109 S.Ct. 3086; *Lynch,* 465 U.S. at 693, 104 S.Ct. 1355; *School Dist. of Abington Tp.,* 374 U.S. at 303, 83 S.Ct. 1560; *Engel,* 370 U.S. at 440 n. 5, 82 S.Ct. 1261 (Douglas, J. concurring). Title 31, U.S.C. §§ 324 and 324(a) require the imprinting of the national motto "In God We Trust" on the coin and currency of the United States.

In *County of Allegheny,* 492 U.S. at 602–603, 109 S.Ct. 3086, Justice Blackmun, writing for the Court, acknowledged:

Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief.

The Court has never suggested that the national motto or the Pledge of Allegiance are unconstitutional. The national motto has been upheld by three circuit courts. *See Gaylor v. United States,* 74 F.3d 214 (10th Cir.1996); *O'Hair v. Murray,* 588 F.2d 1144 (5th Cir.1979) *(per curiam ) cert. denied,* 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); *Aronow v. United States,* 432 F.2d 242 (9th Cir.1970).

The national motto "In God we trust" is prominently engraved on the wall above the speaker's dias in the chamber of the House of Representatives. *See County of Allegheny,* 492 U.S. at 673, 109 S.Ct. 3086. It is also engraved over the entrance to the Senate chambers. *See Engel,* 370 U.S. at 440 n. 5, 82 S.Ct. 1261.

Congress has set aside a special prayer room in the Capitol for use by members of the House and Senate. This room is decorated with a large stained glass panel that depicts President Washington kneeling in prayer. Around him is etched the first verse of the Sixteenth Psalm: "Preserve me, O God, for in Thee do I put my trust." *See County of Allegheny,* 492 U.S. at 672, 109 S.Ct. 3086.

Congress has directed the president to proclaim a National Day of Prayer each year "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 169h. Our presidents have repeatedly issued such proclamations. *See Lynch,* 465 U.S. at 677, 104 S.Ct. 1355.

The National Anthem, adopted by an official act of Congress, concludes with the following verse:

Oh! thus be it ever, when freemen shall stand

Between their loved home and the war's desolation!

Blest with victory and peace, may the heav'n rescued land

Praise the Power that hath made and preserved us a nation.

Then conquer we must, when our cause it is just,

And this be our motto: 'In God is our trust.'

And the star-spangled banner in triumph shall wave

O'er the land of the free and the home of the brave.

Plaintiffs argue that this case should not be governed by the rule in *Marsh* because, in their view, its holding is limited to practices which "*themselves* were sanctioned by their history and ubiquity." Memorandum In Re-

ply, p. 21 (emphasis in the original). Thus, plaintiffs argue that *Marsh* must be limited to only those specific practices which began at or before the foundation of the republic and not similar or equivalent practices of later origin. The rule of *Marsh* is not so limited. Nebraska, of course, was not one of the original thirteen states. It was not admitted to the union until 1867, yet the Court upheld its practice of opening legislative sessions with prayer. Furthermore, the Nebraska practice did not precisely coincide with the practice of the original Congress. For example, in Nebraska, one Presbyterian minister served for over 16 years. In contrast, the original Congress provided for the appointment of two chaplains of different denominations who would alternate between the two chambers on a weekly basis. *Marsh*, 463 U.S. at 793 n. 13, 103 S.Ct. 3330.

Ohio's motto was adopted nearly forty years ago. At least five other states have mottoes which have some religious content.[10] The national motto "In God we trust" was not officially adopted until 1956, just three years before Ohio adopted its motto.[11] The phrase "Under God" was not added to the Pledge of Allegiance until 1954. H.R.J.Res. 243, 83d Cong., 68 Stat. 249 (1954). The National Anthem was adopted by an act of Congress in 1931. *See* 36 U.S.C. § 170.

The Court in *Marsh*, 463 U.S. at 790–791, 103 S.Ct. 3330, did not limit its ruling to only those practices which could trace their origins to the founding of the republic; instead, the Court said, "[I]t would be incongruous to interpret that Clause as imposing more stringent First Amendment limits on the states than the draftsmen imposed on the Federal Government."

This Court concludes that, like *Marsh*, this case is an exception to the rule of *Lemon v.*

*Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court said in *Lynch*, 465 U.S. at 679, 104 S.Ct. 1355, that *Lemon* was not the exclusive test or criterion in Establishment Clause cases. In *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Court said that the three prongs of the *Lemon* test "are no more than helpful signposts, ..." But even if *Lemon* were applicable here, the result would not change. The motto has a valid secular purpose. "It inculcates hope, makes Ohio unique, solemnizes occasions, and acknowledges the humility that government leaders frequently feel in grappling with difficult public policy issues." Memorandum Contra Plaintiffs' Motion for Preliminary Injunction, p. 21. Viewed in the context of a long tradition of government acknowledgment of religion in mottoes, oaths, and anthems, the Ohio motto does not have the primary or principal purpose of advancing religion, and it does not foster excessive government entanglement with religion. *See Gaylor v. United States*, 74 F.3d 214 (10th Cir.1996).

Fourteen years ago in *Lynch*, 465 U.S. at 667–668, 104 S.Ct. 1355, Justice O'Connor proposed a new two-pronged test for Establishment Clause cases: "entanglement" and "endorsement". Her endorsement test has received support from other members of the Court and it appears that a majority of the Court applied it in *County of Allegheny*. Under Justice O'Connor's endorsement test, the Establishment Clause is violated when an objective and informed observer would conclude that the government action in question "sends a message to nonadherents that they are outsiders, not full members of the political community, ..." *See Wallace*, 472 U.S. at 76, 105 S.Ct. 2479; *Lynch*, 465 U.S. at 688, 104 S.Ct. 1355.[12]

**10.** Arizona—Ditat Deus (God enriches)
Colorado—Nil Sine Numine (Nothing without Providence)
Connecticut—Qui Transtulit Sustinet (He Who Transplanted, Still Sustains)
Florida—In God We Trust
South Dakota—Under God the People Rule.
BRIAN BURRELL, THE WORDS WE LIVE BY 300–301 (1997).

**11.** Congress authorized the motto to be included on certain coins in 1865. 13 Stat. 518.

**12.** It is curious why it is not a sufficient answer to such a person that the Constitution guarantees the right of full participation in the democratic process regardless of religious belief. *See* U.S. CONST. art. VI, cl. 3: "but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." *See also Kramer v. Union Free School Dist. No. 15.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (Equal Protection Clause of Fourteenth Amendment applies to the right to vote).

Ohio's motto passes Justice O'Connor's endorsement test. In *Lynch,* 465 U.S. at 693, 104 S.Ct. 1355, Justice O'Connor said that governmental "acknowledgments" of religion, such as legislative prayers, government declaration of Thanksgiving as a public holiday, printing "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court" serve

> in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

*See also County of Allegheny,* 492 U.S. at 595, 109 S.Ct. 3086.

If the various actions of the federal government reviewed above do not offend the Establishment Clause, there can be little doubt that Ohio's motto "With God All Things Are Possible" does not. It is entirely proper for the state to inscribe the motto with the state seal on a granite pavement at the entrance to its state capitol building and to use it in like manner on official documents.

The Justices of the Supreme Court disagree among themselves on the proper role of religion in public life and the extent of the Court's authority to decide these issues under the Establishment Clause. This debate is not merely an academic exercise. Indeed, the fundamental question is just what values may properly inform and mould the public policy of the nation. Will they be exclusively secular or will they include the values embodied in the nation's religious heritage? Some argue that government's position must be one of strict neutrality. Others argue

that in the realm of values, there is no such thing as neutrality. Indeed, it seems indisputable that the laws of every society reflect certain moral presuppositions. The law prohibits, allows, or promotes certain behaviors based upon what that society deems right or wrong. In America today, both sides of the debate on such divisive public issues as abortion, euthanasia, homosexuality, and pornography are taking a distinct moral stance. Thus, the issue of the role of religion in public life is an important one which deserves the public's attention.

History has played a significant role in the Court's interpretation of the Establishment Clause. The average citizen, as well as the constitutional scholar, understands that the history surrounding the writing of the Constitution sheds light on what it meant to the men who wrote it, and to the people of the United States who ratified it through their duly elected representatives. Those who oppose government acknowledgment of religion invariably invoke the now famous words of Thomas Jefferson who said that the Establishment Clause was intended to erect "a wall of separation" between church and state.[13] Many Americans assume that Jefferson played an instrumental role in the adoption of the First Amendment and that his metaphor is an authoritative comment on its meaning. This belief, which has reached the status of a civic myth, has contributed to public confusion about the history and meaning of the First Amendment. In fact, Jefferson had no role in the drafting of the Constitution or the Bill of Rights. Indeed, he was not even in the country; he was in France, where he served as United States minister to the French government from 1785 to 1789. Jefferson's comment about a wall of separation was contained in a letter he wrote more than a decade after the Bill of Rights was ratified by the states.[14]

---

**13.** The plaintiffs in this case began their legal arguments on the merits of their claims by quoting a passage from *Everson v. Board of Ed of Ewing Tp.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947), which concludes with Jefferson's wall of separation metaphor. *See* Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, p. 5.

**14.** Jefferson's famous comment was contained in a letter he penned on January 1, 1802 to a committee of the Danbury Baptist Association of Connecticut which had written to congratulate him on his election as the third president of the United States. *See* Daniel Dreisbach, *Sowing Useful Truths and Principles: The Danbury Baptists, Thomas Jefferson, and the "Wall of Separation,"* 39 J. CHURCH & ST. 455 (1997).

Jefferson, who was the third president of the United States, was an advocate of the anti-religious philosophy of the European Enlightenment.[15] His position on the role of religion in public life stands in stark contrast to that of the nation's first president.[16] George Washington was not only the first Chief Executive but he was also the President of the Constitutional Convention and presided over that body's deliberations as it drafted the Constitution. He was the most highly respected public figure of the day. In his first inaugural address, Washington deliberately made prayer a part of his first official act as President:

> [I]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes.

*Lee v. Weisman,* 505 U.S. 577, 633, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

The most compelling evidence of the meaning of the Establishment Clause is to be found in the actions of the Congress which drafted it and submitted it to the states for their approval. The first Congress is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument." *Myers v. United States,* 272 U.S. 52, 174–175, 47 S.Ct. 21, 71 L.Ed. 160 (1926). *See also Lynch,* 465 U.S. at 674, 104 S.Ct. 1355. On the same day it approved the language of the First Amendment, the first Congress urged the president to declare "a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many signal favours of Almighty God." *See Lynch,* 465 U.S. at 675 n. 2, 104 S.Ct. 1355. On the very same day it approved the language of the Establishment Clause, the first Congress reenacted the Northwest Ordinance. Article 3 thereof states:

> Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

Northwest Territory Ordinance, Art. III, 1 Stat 51n, 52n (1787). Congress made adherence to the Northwest Ordinance a condition of statehood.

The actions of the first Congress were a clear signal to the states that the members of that first Congress believed it was proper under the Establishment Clause for the federal government to acknowledge religion in various ways. The states ratified the First Amendment after the first Congress took these actions, and no records exist indicating that the states voiced any disagreement with Congress's interpretation of the Establishment Clause as evidenced by its actions. Thus, it is fair to assume that the Bill of Rights was ratified with the understanding that those actions were proper under the First Amendment.

That this nation was founded on transcendent values which flow from a belief in a Supreme Being seems beyond dispute. The Declaration of Independence, which specifically invokes the deity on four occasions states:

---

15. MARK DEWOLFE HOWE, THE GARDEN AND THE WILDERNESS: RELIGION AND GOVERNMENT IN AMERICAN CONSTITUTIONAL HISTORY 2 (1965). The Enlightenment was an 18th century philosophical movement which advocated a rationalistic world view and the substitution of secularism for the prevailing Christian world view. *See* Lester G. Crocker, *Enlightenment, in* ENCYCLOPEDIA AMERICANA (Int'l. ed.1994).

16. Nevertheless, Jefferson's wall of separation was not so high that it prevented him from supporting religion when it served secular purposes he considered important such as pacifying the Indians or encouraging moral behavior by students at his beloved University of Virginia. As President, he signed laws and treaties which provided public funding to support missionaries and churches in Indian territory and as Rector of the University of Virginia, a state institution, he promulgated regulations which included the admonition that students were "expected to attend religious worship." *See* ROBERT L. CORD, SEPARATION OF CHURCH AND STATE: HISTORICAL FACT AND CURRENT FICTION 38–45 (1982); THE WRITINGS OF THOMAS JEFFERSON 449 (Memorial ed.1904).

We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator, with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness—...

Washington, in his farewell address said:

Of all the dispositions and habits which lead to political prosperity, religion and morality are indispensable supports.... Whatever may be conceded to the influence of refined education on minds of peculiar structure, reason and experience both forbid us to expect that national morality can prevail in exclusion of religious principle.[17]

John Adams, the nation's second president, said:

"Our Constitution was made only for a moral and religious people. It is wholly inadequate to the government of any other" [18]

In *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Supreme Court said, "We are a religious people whose institutions presuppose a Supreme Being."

In *School Dist. of Abington Tp.*, 374 U.S. at 213, 83 S.Ct. 1560, the Supreme Court said:

The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself.

Thirty-five years ago, Justice Goldberg warned that "untutored devotion to the concept of neutrality" can lead to "a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious," a result "not only not compelled by the Constitution, but ... prohibited by it." [19] *School Dist. of Abington Tp.*, 374 U.S. at 306, 83 S.Ct. 1560. I believe that striking down

Ohio's motto "With God all things are possible" would evince the kind of brooding devotion to the secular which Justice Goldberg warned against.

### CONCLUSION

Plaintiff's motion for declaratory and permanent injunctive relief is granted in part and denied in part. Plaintiff's request for declaratory and injunctive relief declaring the motto "With God all things are possible" unconstitutional and permanently enjoining its use as the official motto of the state of Ohio and specifically enjoining the state from installing the motto at the Capitol Square Plaza are hereby denied. The state of Ohio is permanently enjoined from attributing the words of the motto to the text of the Christian New Testament.

The Clerk shall enter final judgment in accordance herewith.

It is so ORDERED.

---

17. *1 DOCUMENTS OF AMERICAN HISTORY* (Henry Steele Commager & Milton Canto eds., 10th ed.1988).

18. ARLIN M. ADAMS & CHARLES J. EMANEVICH, A NATION DEDICATED TO RELIGIOUS LIBERTY: THE CONSTITUTIONAL HERITAGE OF THE RELIGION CLAUSES 27 (1990).

19. *Justice Goldberg's comments stand in contrast to the recent comments of Justice Ginsberg who, in* Pinette, *515 U.S. at 817, 115 S.Ct. 2440, cited with approval a law review article which proclaimed that the Establishment Clause "implies affirmative establishment of secular public order."*