*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0148P (6th Cir.)
File Name: 00a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AMERICAN CIVIL LIBERTIES
UNION OF OHIO; MATTHEW
PETERSON, Reverend,
  *Plaintiffs-Appellants,*

   *v.*

CAPITOL SQUARE REVIEW
AND ADVISORY BOARD;
ROBERT TAFT, Governor of
Ohio; RONALD R. KELLER;
DANIEL SHELLENBARGER;
RICHARD H. FINAN; J.
KENNETH BLACKWELL,
Secretary of State; THOMAS
M. ZAINO, Tax
Commissioner,
  *Defendants-Appellees.*



No. 98-4106

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00863—James L. Graham, District Judge.

Argued: November 4, 1999

Decided and Filed:  April 25, 2000

Before:  MERRITT and NELSON, Circuit Judges; COHN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Mark B. Cohn, McCARTHY, LEBIT, CRYSTAL & HAIMAN, Cleveland, Ohio, for Appellants. David M. Gormley, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees. **ON BRIEF:** Mark B. Cohn, McCARTHY, LEBIT, CRYSTAL & HAIMAN, Cleveland, Ohio, Susan B. Gellman, WOLMAN, GENSHAFT & GELLMAN, Columbus, Ohio, Thomas D. Buckley, Jr., ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, for Appellants. Edward B. Foley, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees. David R. Huggins, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, John G. Stepanovich, Shawn A. Voyles, THE AMERICAN CENTER FOR LAW & JUSTICE MID-ATLANTIC, Virginia Beach, Virginia, for Amici Curiae.

COHN, D. J., delivered the opinion of the court. MERRITT, J. (pp. 53-57), delivered a separate concurring opinion, in which COHN, D. J., joined. NELSON, J. (pp. 58-61), delivered a separate dissenting opinion.

_____

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

COHN, District Judge.

*By separating government and religion the establishment clause enables [a religious heterogeneous] society to maintain some civility among believers and unbelievers as well as among diverse believers.*

*– Leonard Levy*[1]

### I. Introduction

#### A. Issue

In this case we are called upon to decide whether or not the official motto of the State of Ohio, "With God All Things Are Possible," taken directly from the New Testament of the Christian Bible, violates the Establishment Clause of the First Amendment to the Constitution. Disagreeing with the district court, which found the words of the motto compatible with the Constitution, *American Civil Liberties Union v. Capitol Square,* 20 F. Supp. 2d 1176 (S.D. Ohio 1998), we find that it does violate the Establishment Clause and, accordingly, reverse the district court. Review is *de novo*, *New Life Baptist Church Academy v. Town of East Long Lake Meadow*, 885 F.2d 940, 941 (1st Cir. 1989). Our reasons follow.

#### B. Parties

Plaintiffs-appellants are the American Civil Liberties Union of Ohio and Matthew Peterson, a Presbyterian Minister. Defendants-appellees are the Capitol Square Review and

---

[1]Leonard W. Levy, *Origins of the Bill of Rights* 102 (Yale Univ. Press 1999).

Advisory Board (Board), Ronald T. Keller, Executive Director of the Board, Daniel Shellenbarger, Assistant Director of the Board, and Richard H. Finan, an Ohio State Senator and chairperson of the Board, as well as George Voinovich, then Governor of Ohio, Bob Taft, then Secretary of State of Ohio, now Governor, and Roger W. Tracy, then Commissioner of the Ohio Department of Taxation. The defendants collectively will be referred to as the State.

### C. Background

### 1.

After seeing the motto, "Government Work is God's Work," inscribed on a public building in India, Governor Voinovich urged the Board to install an engraved state seal and the words of the Ohio motto on a granite plaza at the west end of the state house located in Capitol Square Plaza. In 1996, following an announcement that the Board intended to do so, plaintiffs brought suit for a declaratory judgment and injunction.[2] Following a one-day trial, at which experts in the field of religion testified as to the origins and interpretation of the words of the motto *in the context* of which they are found in the New Testament, and numerous exhibits were received into evidence, the district court found that the words of the motto were compatible with the Establishment Clause[3] and denied plaintiffs relief. The district court, however, without explanation, permanently enjoined the State of Ohio from attributing the words of the motto to the text of the New Testament.

---

[2]While the suit is directed primarily at the installation in the Capitol Square Plaza, the clear thrust of the complaint is at the use of the words of the motto in all forms by the State of Ohio.

[3]The Establishment Clause reads in relevant part: "Congress shall make no law respecting an establishment of religion . . . ." Under *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943), it is applicable to the several states through the Fourteenth Amendment.

F.Supp. 1183-85 makes it obvious, I think, that the Framers themselves would not have dreamed that the adoption of Ohio's religiously-oriented motto could be thought to constitute an "establishment of religion." In an action no less "political" than the adoption of the national and state mottos, for example, the Congress that gave us the First Amendment called upon President Washington to proclaim – as he did – "a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God." *Id.* at 1181 (citation omitted).

"'Establishment of religion,' as the term was used in the days of the Founders, connoted such things as the payment of clerical salaries by the state, the governmental prescription of articles of faith, the imposition of religious tests for office, and the official endorsement of particular forms of worship." *American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561, 1568-69 (6th Cir.) (Nelson, J., dissenting), *cert. denied*, 479 U.S. 939 (1986). James Madison – "the draftsman of and the guiding hand behind the First Amendment," as the concurring opinion accurately describes him – said during the debates of the First Congress that led up to the adoption of the Establishment Clause that "he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." 1 Annals of Cong. 730 (1789), as quoted in *Wallace v. Jaffree*, 472 U.S. 38, 95 (1985) (Rehnquist, J., dissenting). Ohio's motto comes nowhere close to doing this.

My problem, of course, is that within my lifetime there has been a radical evolution in judicial thinking on what the Establishment Clause proscribes. Justice Rehnquist, as he then was, alluded in his *Wallace* dissent to a "mischievous diversion of judges from the actual intentions of the drafters of the Bill of Rights." *Id.* at 107. Mischievous or not, the diversion is an obvious fact.

To say precisely how far the diversion from the Founders' intentions has progressed calls for powers of analysis – or divination – that I do not possess. If the spirit that animated the Supreme Court's decision in *Marsh v. Chambers* were to guide us here, we would decide the present case in accordance with the original understanding of the phrase "an establishment of religion." But I readily acknowledge that the *Marsh* approach is not one that has been followed consistently – and that is why I have chosen to rest mainly on the proposition that if the national motto is constitutional, Ohio's motto is constitutional too. This may be simplistic, but I hope it at least has the virtue of being comprehensible.

could not have identified the source of either motto, and I doubt that it is vanity alone which prompts me to suggest that my ignorance is far from atypical.

If I am wrong in thinking that the reasonable observer need not be omniscient, on the other hand, it is by no means clear to me that an omniscient observer would recognize that our national motto is not an endorsement of Judaism but would conclude that Ohio's motto is nonetheless an endorsement of Christianity. Such an observer – completely familiar with the long tradition of "ceremonial deism" described in the majority opinion – would reasonably conclude, I believe, that both the Ohio motto and the national motto fit comfortably within that tradition.

An omniscient observer would know that Ohio's motto law (Ohio Rev. Code §5.06) is codified in the same chapter as statutes designating the state wild flower (Ohio Rev. Code § 5.021), the official state bird (Ohio Rev. Code § 5.03), the official state animal (Ohio Rev. Code § 5.032), the state coat of arms (Ohio Rev. Code § 5.04), the official state tree (Ohio Rev. Code § 5.05), the official state gem stone (Ohio Rev. Code § 5.07), the official state invertebrate fossil (Ohio Rev. Code § 5.071), the official state beverage (Ohio Rev. Code § 5.08), and the state song (Ohio Rev. Code § 5.09). The statutory context hardly suggests that the challenged law involves an establishment of religion.

Accordingly, and for substantially all of the reasons given by the district court in its scholarly and thoughtful opinion, *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board*, 20 F. Supp.2d 1176 (S.D. Ohio 1998), I would affirm the holding that Ohio has not acted unconstitutionally.[2]

---

[2]The concurring opinion prompts me to add that if the constitutionality of Ohio's motto were to be decided according to the intent of the Framers of the Establishment Clause, this would be a very easy case indeed. The evidence marshalled by the district court at 20

### 2.

The words of the motto, "With God All Things Are Possible," are a direct quotation from Chapter 19, Verse 26 of the Gospel According to Matthew of the New Testament. It reads in relevant part:

The children were brought to him that he might lay his hands on them and pray. The disciples rebuked the people; but Jesus said, "Let the children come to me, and do not hinder them; for to such belongs the kingdom of heaven." And he laid his hands on them and went away.

And behold, one came up to him, saying, "Teacher, what good deed must I do, to have eternal life?" And he said to him, "Why do you ask me about what is good? One there is who is good. If you would enter life, keep the commandments." He said to him, "Which?" And Jesus said, "You shall not kill, You shall not commit adultery, You shall not steal, You shall not bear false witness, Honor your father and your mother, and, You shall love your neighbor as yourself." The young man said to him, "All these I have observed; what do I still lack?" Jesus said to him, "If you would be perfect, go, sell what you possess and give to the poor, and you will have treasure in heaven; and come, follow me." When the young man heard this he went away sorrowful; for he had great possessions.

And Jesus said to his disciples, "Truly, I say to you, it will be hard for a rich man to enter the kingdom of heaven. Again I tell you, it is easier for a camel to go through the eye of a needle than for a rich man to enter the kingdom of God." When the disciples heard this they were greatly astonished, saying, "Who then can be saved?" But Jesus looked at them and said to them, "*With men this is impossible, but with God all things are possible.*"

*Matthew* 19:13-26 (Oxford Annotated Bible with the Apocrypha, Revised Standard Version)[4] (emphasis added).

Essentially, what is being described is a dialogue between Jesus, a rich young man, and Jesus' disciples in which Jesus concludes by saying that the salvation of a rich man is a miracle that only God can accomplish. A similar account is found in *Mark* 10:14-27 and *Luke* 18:15-27.

3.

a.

The American Heritage Dictionary of the English Language (3d ed.1992) describes as the central and most commonly sought meaning of *Jesus*, *Christ*, *Christianity,* and *Christian* as follows:

- Jesus - A teacher and prophet who lived in the first century of this era and whose life and teachings form the basis of Christianity. Christians believe Jesus to be Son of God and the Christ.

- Christ - The Messiah, as foretold by the prophets of the Old Testament.

- Christianity - The Christian religion, founded on the life and teachings of Jesus.

- Christian - Professing belief in Jesus as Christ or following the religion based on the life and teachings of Jesus.

The American Heritage Dictionary further describes as the central and most commonly sought meaning of *Matthew*, *Apostle, Gospel,* and *Salvation* as follows:

---

[4]The King James Version and the Revised Standard Version differ slightly in text. *See* The Interpreters Bible, Vol. VII pp. 482-87.

similar.[1] A person exceptionally well versed in the bible, on the other hand, might be aware that the declaration about trusting in God harkens back to the pre-Christian Old Testament (see Psalms 56:11), while the declaration about all things being possible with God is part of a statement that the Christian New Testament attributes to Jesus in a context unique to Christianity. See Matthew 19:26.

I do not quarrel with the proposition that a government motto would be unconstitutional, under our current understanding of the Establishment Clause, if a hypothetical "reasonable observer" would take Ohio's motto to be an official endorsement of the Christian religion. I do not understand, however, why the observer should be deemed to be omniscient as well as reasonable. All that is suggested by the adjective "reasonable," I believe, is an observer who is an "informed member of the community" and who is "aware of the history and context of the *community* and *forum*" in which the challenged expression appears. See *Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. at 780-81 (1995) (O'Connor, J., concurring) (emphasis supplied). Such an observer should not, I think, be presumed to have an encyclopedic knowledge of the Old and New Testaments. "There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion," as Justice O'Connor observed in her *Capitol Square* opinion, *id.* at 780, but that exceptional "someone" is not our reasonable observer.

If I am correct in my understanding of the test, I do not believe that a reasonable observer in Ohio would find "With God All Things Are Possible" significantly more problematic than "In God we trust." I confess that prior to this lawsuit I

---

[1]The concurring opinion suggests that a reasonable observer would understand that the God of whom the national motto speaks could be a mere golden calf, while the God of whom the state motto speaks could not. The distinction, it seems fair to say, is one that would not leap readily to the minds of most observers.

————————————

## DISSENT

————————————

   DAVID A. NELSON, Circuit Judge, dissenting. In 1956 Congress enacted a law, now codified at 36 U.S.C. § 302, declaring the national motto to be "In God we trust." Three of our sister circuits have upheld the constitutionality of this federal statute against claims that it violates the First Amendment as a "law respecting an establishment of religion. . . ." *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970); *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir.), *cert. denied*, 442 U.S. 930 (1979); *Gaylor v. United States*, 74 F.3d 214 (10th Cir.), *cert. denied*, 517 U.S. 1211 (1996). The Supreme Court has never questioned the conclusion reached in these decisions.

   In 1959 the Ohio legislature enacted a law adopting "With God All Things Are Possible" as the official motto of the state.   See Ohio Rev. Code § 5.06.   The Fourteenth Amendment makes the Establishment Clause of the First Amendment applicable to the states, but the Supreme Court has told us that "it would be incongruous to interpret that Clause as imposing more stringent First Amendment limits on the states than the draftsmen imposed on the Federal Government." *Marsh v. Chambers*, 463 U.S. 783, 790-91 (1983). This being so, and assuming (as I do) that the national motto is not unconstitutional, I am led to the question whether there is such a pronounced difference between "In God we trust" and "With God All Things Are Possible" that adoption of the latter declaration as a motto must be held to violate the Establishment Clause notwithstanding that adoption of the former is constitutionally permissible.

   To a reasonable observer who did not happen to be a biblical scholar, it seems to me, "In God we trust" and "With God All Things Are Possible" would appear remarkably

- Matthew - One of the 12 Apostles and the traditionally accepted author of the first Gospel of the New Testament.

- Apostle - One of a group made up especially of the 12 disciples chosen by Jesus to preach the gospel.

- Gospel - One of the first four books of the New Testament, describing the life, death, and resurrection of Jesus and recording his teaching.

- Salvation - Deliverance from the power or penalty of sin; redemption.

   These definitions are important to an understanding of the reasons for our decision.

b.

   In *Lynch v. Donnelly*, 465 U.S. 668, 708 (1984), Justice Brennan, in describing the nativity scene (the place of Jesus' birth), a scene "rooted in a biblical account of Christ's birth," said in his dissenting opinion:

   It is the chief symbol of the characteristically Christian belief that a divine Savior was brought into the world and that the purpose of this miraculous birth was to illuminate a path towards salvation and redemption.

In a footnote Justice Brennan further explained:

   For Christians, of course, the essential message of the nativity is that God became incarnate in the person of Christ. But just as fundamental to Jewish thought is the belief in the "non-incarnation of God, . . . [t]he God in whom [Jews] believe, to whom [Jews] are pledged, does not unite with human substance on earth." . . . This distinction, according to [Martin] Buber, "constitute[s] the ultimate division between Judaism and Christianity."

465 U.S. at 708 n. 14 (internal citations omitted.)

As such, Jesus is unique among all figures of the Christian bible.

#### D. The District Court Decision

#### 1.

The decision of the district court, finding the words of the motto compatible with the Establishment Clause, began by decontextualizing the meaning of Jesus' words:

> While the words of the motto appear to have been taken from the Christian New Testament, specifically Matthew 19:26, they are only part of a sentence in that passage and they have been completely removed from the context in which they were used.
>
> Removed from their Christian New Testament context, the words of the motto do not suggest a denominational preference. They do not state a principle unique to Christianity. They could be classified as generally theistic. They are certainly compatible with all three of the world's major monotheistic religions: Judaism, Christianity, and Islam. Statements similar to the words of the motto are found in the Hebrew Bible as well as the Qur'an, the sacred book of the Muslims.

20 F. Supp. 2d at 1178-79 (footnotes omitted). The court went on to apply a subjective test for a reasonably informed observer (to be discussed below) reading the words of the motto:

> Plaintiffs have presented no evidence that a reasonable person who reads the words of the motto would recognize them as the words of Jesus or understand them as suggesting a denominational preference. Plaintiffs' witness, Rabbi Harold Berman, of Columbus, Ohio, senior Rabbi of the Congregation Tefereth Israel for

temple. The God of Ohio's biblical motto is the God of particular Christian religious groups. The God of Ohio's biblical motto prefers one set of groups and one theology over another, a God who excludes nonbelievers and many other Christians from being "saved" and from entering "into the kingdom of heaven." In the biblical passage from which Ohio's motto takes its meaning, "treasure in heaven" and God's approval can only come if the believer will, in the words of Jesus, "follow me" and "be saved." Thus Ohio's motto is unconstitutional under the Establishment Clause because it discriminates among religions and groups within the Christian religion and encourages a particular Christian doctrine. It violates the Establishment Clause because it does not meet the test set out by Madison's colleague, Elbridge Gerry, expressed in the congressional debates on the Establishment Clause "that no religious doctrine shall be established by law," — a major principle underlying the "equal liberty of conscience" that the framers intended to enact. 1 *Annals of Congress* 729.

For these reasons and the reasons set out in Judge Cohn's well-researched opinion for the Court, Ohio's legislated motto "With God, All Things Are Possible" must be declared in violation of the Establishment Clause of the First Amendment of the Constitution of the United States.

primary nor the secondary meaning of the words of Ohio's biblical motto is true. Although many Christian believers accept these verses as true, others do not believe that a powerful, all-knowing personal God intervenes in daily affairs. They do not believe literally in the type of personalized salvation expressed by Matthew. In addition, many skeptics and nonbelievers hold that this state imposed biblical verse is untrue. For example, the *Scientific American* recently reported a survey of the 1800 members of the National Academy of Sciences which shows that over 90 per cent of the Academy — created by Congress in 1863 — do not believe in a personal God who intervenes in the affairs of human beings. E. Larson and L. Whitham, "Scientists and Religion in America," *Scientific American* (Sept. 1999).

*Third*. Whatever may be the meaning of the phrase, "In God We Trust" on the coin of the realm, it does not specify a personal, all-powerful, all-knowing God which makes "all things possible" by intervening in daily affairs. It does not necessarily run contrary to the religious beliefs of any particular Christian denomination or group or any other religion. It may not be entirely consistent with the views of the National Academy of Sciences and nonbelievers, but it is not particularly offensive. The god in whom we "trust" could be the god of Jefferson's deism or even perhaps the laws of science or the cosmology of Newton or Einstein. The phrase is sufficiently vague that it does not define the particular god of any religion. Neither does it have a secondary meaning, a connotation, a context, that requires that all of the coin of the realm on which the phrase appears be "give[n] to the poor" in order for the "rich man to enter into the kingdom of God." The god of the silver coin and the dollar bill — "In Whom We Trust" — may be merely mammon or may be drawn from any of the gods in the world's vast pantheon of divinity that has accumulated from Greek times to the present. The god of the coin of the realm is not by any means the "God" of Matthew 19:21-26, who makes "all things possible," a God who disapproves of mammon, and who through his son, Jesus Christ, reportedly threw the money changers out of the

eighteen years, did not recognize the source of the motto when he first became familiar with it. He was only able to say that it "sounded vaguely familiar." Defendants' witness, Dr. David Belcastro, an associate professor of religious studies at Capital University in Columbus, Ohio, opined that the average college student would not know the source of the motto. The Court concludes that an objective and reasonably informed observer would not perceive the motto as sectarian.

20 F. Supp. 2d at 1179.

The district court found as the definitive meaning of the words of the motto:

It inculcates hope, makes Ohio unique, solemnizes occasions, and acknowledges the humility that government leaders frequently feel in grappling with difficult public policy issues.

20 F. Supp. 2d at 1182 (quoting the Memorandum Contra Plaintiffs' Motion for Preliminary Injunction p. 21.)

Finally, apparently to assure the continued decontextualization of the words of the motto, and to avoid any possibility of attaching a religious meaning to them, the district court, without explanation or elaboration, "permanently enjoined [the state of Ohio] from attributing the words of the motto to the text of the Christian New Testament." 20 F. Supp. 2d at 1185.

## 2.

In sum, the district court's decision is predicated on a reading of the words of the motto out of context, viewing them subjectively, and prohibiting the State of Ohio (and presumably all of its officers and employees) from disclosing the origin of the words of the motto.

### E. Adoption Of The Motto

The words were adopted as the official state motto in 1959 by an act of the General Assembly of the State of Ohio, Ohio Rev. Code § 506,[5] following the suggestion of a 12 year old Cincinnati school boy. In publicizing its adoption, and the suggestion that October 1, the day the motto became official, be designated as "motto day" in Ohio, the Secretary of State said in a press release:

The boy started petitioning the Legislature when he was 9 years old, [sic] Jimmy chose a verse in the New Testament, Matthew 19:26, "But Jesus beheld them and said unto them, With men this is impossible; but with God, all things are possible," from which to draw the official motto.

## II. The Trial

The trial record reflects the testimony of experts in religion regarding the meaning of the words of the motto, examples of official use of the words of the motto, and miscellaneous documentary evidence relating to citizens' understanding of, and attitudes regarding, the use of the words of the motto.

---

[5]There is no formal legislative history of the act.

Ohio's biblical motto test tends to establish a "confessional state" and is therefore invalid. *Stein v. Plainwell Community Schools*, 822 f.2d 1406, 1408 (6th Cir. 1987).

*Second*. The words "With God, All Things Are Possible" have meaning. The most obvious primary meaning of the words is that a personal, all-knowing, all-powerful God intervenes in the daily affairs of individuals and through this miracle of supernatural intervention makes "all things possible." The secondary meaning, or the connotation of the words, as Judge Cohn's opinion for the Court makes clear, comes from the context from which the words were taken. Salvation, eternal life and "treasure in heaven" can only be achieved in one way:

Jesus said unto him, if thou wilt be perfect, go and sell that thou hast, and give to the poor, and thou shalt have treasure in heaven; and come and follow me.

But when the young man heard that saying, he went away sorrowful; for he had great possessions.

Then said Jesus unto his disciples, Verily I say unto you, That a rich man shall hardly enter into the kingdom of heaven.

And again I say unto you, It is easier for a camel to go through the eye of a needle  than for a rich man to enter into the kingdom of God.

When his disciples heard it, they were exceedingly amazed, saying, Who then can be saved?

But Jesus beheld them, and said unto them, *With men this is impossible*; *but with God all things are possible.*

Matthew 19:21-26 (emphasis added).

Most of the world's many religions and some Christian sects, denominations and theologians  believe that neither the

constitutional and it equals "With God, All Things Are Possible" and hence the latter must also be constitutional.

This argument is misguided for a large number of reasons, three of which I will discuss.

*First*.   Ohio's biblical motto does not meet the Establishment Clause test of "an equal liberty of conscience for all" set out by our court in an Establishment Clause case decided more than a decade ago.  It fails because it is an effort of political and religious groups "to use the state in support of their particular beliefs."  We stated this principle of "equal liberty" as follows:

From the beginning of the colonial period to the present, American churches have taken their various religious differences seriously, and under the Free Exercise and Establishment clauses taken together, we have generally accepted and settled on an accommodation.  The concept of the equal liberty of conscience is our guiding principle.  In our national and community life, we can never be sure whether our particular religious, sectarian and moral convictions will be in the majority or the minority.  So as a diverse people we have rejected the notion of a confessional state that supports religion in favor of a neutral state designed to foster the most extensive liberty of conscience compatible with a similar or equal liberty for others.  To those who act or argue against this principle of equal liberty of conscience on grounds that their duty is to use the state in support of their particular beliefs, we answer that we cannot expect others to accept an inferior liberty.  To those who say that the principle of equal liberty of conscience has the effect of rejecting the absolute nature of their religious beliefs, we reply that if any principle can be agreed to, it can only be that of an equal liberty of conscience for all.

## A. Testimony

### 1.

Ronald Stone, a professor of Christian Ethics at Pittsburgh Theological Seminary, was called as a witness by plaintiffs. He testified as follows:

. . . it was known to be part of the discourse in Matthew about the rich young ruler seeking salvation and asking questions about salvation, and then there's quite a lengthy dialogue,

. . . .

. . . it is in all three of the synoptic gospels, Mark, Matthew, and Luke, and present[s] a view of salvation which denies that it's possible to be saved by the good works of human beings, but it's only by the grace of God that one may be saved, which is quite a foundational document to protestant perspectives and protestant theology,

. . . .

[Jesus is] addressing himself to the listeners who are the disciples. One couldn't exclude some other listeners, but it's not clear that there is a larger group beyond the disciples.  The question has been asked if it's this difficult for the rich who follow all the commandments, how could anyone be saved?  And then the verse that is at question here, and Jesus said unto them, with men, it's impossible, but with God, all things are possible. It's not possible with men. Men cannot do it.  Humans can't do it, we would say in the contemporary world, but God can.

(JA at 119-20, 122).

   Matthew Peterson, associate pastor of a Presbyterian church in Columbus, also called by plaintiffs, explained in response to a question:

   Q.   Does the verse Matthew 19:26 and the other parallel versions in Mark and Luke have continuing religious significance to you as a Christian?

   A.   They do indeed.  Specifically, because we are asked to preach on them at least once every three years, but we really preach on it somewhat more often than that, through the Lectionary,[6] but also it has significance for me because it talks about one of the foundational statements in the Christian church, not just Presbyterian, but the Christian church on how is a person saved.  And since really the establishment of churches in the middle east thousands of years ago, one of the main questions we have had is: Can a wealthy person be saved?  What is the relationship between the wealthy and the poor?  What is our obligation as wealthy people to poor people?  And this statement by Jesus helps us very fundamentally with some of those questions, and we refer to it all the time in the church, not merely once every three years as it appears in the Lextionary [sic].

(JA at 175-76).  Peterson went on to testify:

   In context this has everything to do with salvation, and it has very important relevance to Christian teachings in context.  It is an expression of the omnipotence of God in context with regard specifically to how are we saved.  Through Christ, we are saved.  Can a rich person be saved?  Well, with mortals, with individuals, this is

---

   [6]A lectionary is a book or list of lections to be read at church services during the year.  *See The Revised Common Lectionary* (Abingdon Press 1992).  A lection is a reading from scripture which forms part of a church service.

_____

## CONCURRENCE

_____

   MERRITT, Circuit Judge, concurring.  The argument that persuades Judge Nelson to dissent is not that the intent of the framers of the Establishment Clause, or the evolving principles of separation of church and state over the last 200 years, or the reasoning of a Supreme Court case supports the constitutionality of Ohio's official motto.  No argument based on principle or the constitutional policy underlying the Establishment Clause is advanced.  "With God, All Things Are Possible" would be placed on public buildings, state banners and public documents and publications without any serious attempt to justify such state conduct on the basis of principle.

   The real reason behind this state action adopting a religious verse from the New Testament seems purely political:  To please certain politically influential religious groups.  Madison, the draftsman of and the guiding hand behind the First Amendment, was not wrong when he predicted that such religious and political "coalitions" would develop in the new Republic and that a fundamental law should be adopted to deter government and religious groups from the "tendency to a usurpation on one side or the other, or to a corrupting coalition or alliance between them."  IX *The Writings of James Madison*, 487 (G. Hunt ed. 1910).

   The argument of the State of Ohio and the dissent is simplistic: "With God, All Things Are Possible" is harmless and means approximately the same thing as "In God We Trust."  Since "in God We Trust" is so innocuous that it appears on all of the coin of the realm — all of our paper currency and silver — it must be constitutional and thus it must also be constitutional to require Ohio's official biblical verse to be placed on buildings and official publications.  The argument is a simple syllogism:   "In God We Trust" is

The National Conference for Community Justice, *You Are Asked To Give Public Prayer In A Diverse Society - Guidelines for Civic Occasions* (New York, NY).

Accordingly the decision of the District Court is **REVERSED** and this case is **REMANDED** for entry of a permanent injunction enjoining the State of Ohio, its agents and employees from using the words "With God All Things Are Possible" as the official state motto.

impossible, you cannot effect your own salvation, but with God, with God's grace, a mystery we are not fully sure we understand, we can be saved. God's love is manifold everywhere.

(JA at 176-77). He then concluded:

The state is, if it desires to engage as it appears to do in theological dialogue or discourse, is indeed a formidable opponent. It has a breadth and a depth that I as an individual clergymen do not have, and when they desire to engage in the dialogue, a theological dialogue in explaining what they mean by God, I believe that to be an inappropriate moment for the discussion. The discussion needs to be taking place in synagogues and churches and mosques around the state. And even in the halls of legislature, we can discuss the Lord's intention as individual people, but when the state adopts a motto which necessitates theological dialogue to explain it, for example, we mean it has to do with the omnipotence of God, oh, no, what we mean it has to do with salvation, says Legislator X. In that dialogue, in that debate, you are absolutely having a theological discussion. And when it becomes a part of a building or part of Capitol Square, you are solidifying, quite literally, a statement, a theological statement, about God. And certainly in my view, it violates the First Amendment.

(JA at 177-78).

2.

David Belcastro, an associate professor of Religious Studies at Capital University, was called as a witness by defendants. He testified:

Q. We heard . . . that . . . these words . . . refer to salvation. In your experience as a theologian . . ., have you found that that is universally agreed upon?

A.   No.

Q.   What are other interpretations, . . . .

. . . .

A.   The words "With God All Things Are Possible" are not in reference to salvation. They have to do with discipleship. The question of salvation is not raised by Jesus, it is raised by the rich man in the story. He is preoccupied with his religious standing. Having accomplished a great deal in his life and kept the law, he wonders what more he must do to be saved.

Jesus responds: Sell all that you have, give it to the poor, and follow me, which the rich man is not able to do.

The disciples take up the same question. Well, if he can't be saved, who can? And at this point, Jesus says the phrase about the camel and the eye of the needle, and then followed with "With God All Things Are Possible."

The important point here is what follows shortly thereafter. Jesus, once again in the gospels, is turning people around from their self-centered interest, in this case personal salvation, to his call which is to a radical discipleship, and the very next thing that Jesus says is: If anyone wants to be my disciple, he must deny himself, take up the cross, and follow me, very similar to what he says to the rich young ruler.

The issue for Matthew is not the protestant doctrine of justification by faith, the issue for Matthew is: Who is Jesus, and what is he asking of those who follow him that are entering into this great event that he's anticipating?

to religion. Finding a state's official motto unconstitutional is not something we, as judges, do lightly.

Certainly the citizens of Ohio ought to have the right to collectively assert their spirit and aspirations in the form of a motto without judicial interference – unless in doing so they run afoul of the fundamental laws which govern all of us. However, that is what they have done here. The State of Ohio has not given equal treatment to all religions; it has not taken an even-handed approach; it has not followed a course of conduct that is non-proselytizing and non-sectarian. While the words of the motto may not overtly favor Christianity, as the words of Jesus they, at a minimum, demonstrate a particular affinity toward Christianity in the eyes and ears of a reasonable observer – a person knowledgeable about the Christian Bible and particularly the New Testament. In attempting to accomplish a non-secular result, the State of Ohio has neutered the words of Jesus, a historical figure at least.

In sum, by official action, the Ohio legislature, in following the suggestion of the 12 year old boy who suggested the words of Jesus as the official motto of the state, has given an unconstitutional preference to Christianity. The State of Ohio has effectively said to all who hear or see the words "With God All Things Are Possible," that Christianity is a preferred religion to the people of Ohio.

We recognize that what is good social policy is not always good law. Here, in our view, the two coincide. The National Conference for Community Justice, in advising those who are asked to give prayers in a public setting, says:

Prayer on behalf of the entire community should be easily shared by listeners from different faiths and traditions . . . [and use] forms and vocabulary that allow persons of different faiths to give assent to what is said.

you that that's our view of life here as we open court."
Would that be legal?

ASSISTANT ATTORNEY GENERAL: I think if it
were conveyed in a ceremonial way like the U.S.
Supreme Court marshal's statement, "God save the
United States and this Honorable Court" every time the
nine justices walk in.  That's okay.

THE COURT: If every time we open court here
because we believe it's true we say, "We want to advise
you of our view that with God all things are possible," is
that good or okay?

ASSISTANT ATTORNEY GENERAL: If it's simply
a ceremonial process, I do, but the more you say it, the
more coercive it becomes.

THE COURT: Suppose we had said, "As Jesus Christ
said in Matthew 19, we believe 'with God all things are
possible,'" that we want you to agree with that.  That
would change it, wouldn't it?

ASSISTANT ATTORNEY GENERAL: No, that's not
acceptable, both because you're referring to one
religion's text and you're urging the listeners to accept
that statement.

THE COURT: But if we're quoting from Jesus Christ
and we don't just tell you we're quoting . . . what's the
difference?

ASSISTANT ATTORNEY GENERAL: Because the
words "with God all things are possible" don't convey a
one-religion-only message.

### VII. Conclusion

This decision should not be viewed as hostile to religion,
but rather, an effort to assure government neutrality in relation

Q.  Is it fair to say, Professor, that persons can walk
    away from this phrase, either in isolation or within
    its broader Biblical context, with different
    meanings?

A.  Yes.

Q.  We heard testimony this morning this phrase "With
    God All Things Are Possible", or similar words,
    appear in three of the four gospels.  Are you familiar
    with that?

A.  Yes.

Q.  Does the fact that words similar to the state motto
    appear in those three books have particular
    significance to you as a scholar in terms of their
    authenticity, their ties to Jesus and their validity as
    opposed to other one-time only words of the Bible?

A.  No.

Q.  Why not?

A.  They are completely taken out of context.  The
    words "With God All Things Are Possible" are not
    pivotal words of this particular part of the gospel
    story; they are rather incidental in some ways, and
    they have been lifted out of context.  They do not
    carry the meaning intended by either Matthew,
    Mark, or Luke or the authors attributed to those
    names, and so placed in another context, they are
    open to endless interpretations.

(JA at 210-13).

Thomas D. Kasulis, a professor and the chair of the
Division of Comparative Studies at Ohio State University,
was called as a witness by defendants.  After testifying on
direct examination that the words of the motto were

"exhortative as opposed to factual," Kasulis testified in cross-examination as follows:

Q.  Now, when you say that the phrase "With God All Things Are Possible" is exhortative as opposed to factual, in context, Jesus is talking about "With God All Things Are Possible" to mean that salvation is possible; is he not?

A.  He is saying that what the disciples seem to believe was impossible is possible because of God.

Q.  And what that is is salvation?

A.  That is right, yes. What they were asking about, yes, was salvation.

(JA at 242).

### B. Use Of The Motto

#### 1.

Since their adoption as the official motto in 1959, the words of the motto have been included by successive Secretaries of State on official documents surrounding the official seal, configured as follows:

repeats word-for-word, Jesus' answer to his disciples' questions about the ability to enter heaven, and thereby achieve salvation. As such, to the ears of a reasonable listener, the motto comes directly from the voice of Jesus. To suppress the knowledge that these are the words of Jesus, and to say that they describe something other than the achievement of salvation, is to put a premium on ignorance. Moreover, to enjoin state officials from explaining the origin of the words is to perpetuate such ignorance.

In sum, fairly read and understood, the State of Ohio has adopted a motto which crosses the line from evenhandedness toward all religions, to a preference for Christianity, in the form of Christian text. Thus, it is an endorsement of Christianity by the State of Ohio.[20]

#### 2.

Our conclusion as to the constitutionality of the words of the motto is reinforced by a colloquy at oral argument with the Assistant Attorney General representing defendants:

ASSISTANT ATTORNEY GENERAL: The State of Ohio readily concedes that a motto such as "In Jesus Christ We Trust" would be unconstitutional, and neither the State nor the United States expressed favoritism for one religion in that way.

THE COURT: . . . Suppose our Court every day told the lawyers when they assembled, "Litigants, with faith in God all things are possible, and we are so instructing

---

[20]We are not unmindful of the amicus curiae briefs filed by The American Center for Law & Justice, Mid-Atlantic and The National Legal Foundation, which argue, inter alia, the historical acceptability of government acknowledging God. However, their arguments are dependent upon the decontextualization and sanitization of the words of the motto from their origin, which, as we state in this opinion, is unacceptable.

Moreover, when an attempt is made to give them a different meaning, as can be seen from the testimony at trial, a theological dispute is the inevitable result.[18] Additionally, the injunctive order blotting out their origin or source simply complicates the problem of meaning. Is the injunction to apply only to a written account of the origin of the words of the motto or does it apply, for example, to security officers in Capitol Square when queried by visitors as to the origin of the words of the motto? And what of the Ohio State Historical Society? Is it also barred from explaining the origin of the words of the motto?[19]

The words of the motto are not to be decontextualized in order to allow them to pass constitutional muster. Whether their source is formally attributed or not to *Matthew*, they are the words of Jesus. No amount of semantic legerdemain can hide the fact that the official motto of the State of Ohio

---

Story could say: "it is impossible for those, who believe the truth of Christianity, as a divine revelation, to doubt, that it is the especial duty of government to foster, and encourage it among all the citizens and subjects," Joseph Story, *Commentaries of the Constitution of the United States* 723 (Vol. III, 1833), or that a member of Congress could introduce a bill saying, "Whereas, The people of the United States are a Christian people, and firmly believe in God, the Father Almighty, Maker of heaven and earth; and in Jesus Christ His only Son, our Lord...", H.R. No. 5795 (1880), or that the Supreme Court of Oklahoma could say: "it is well settled and understood that ours is a Christian Nation, holding the Almighty God in dutiful reverence," *Oklahoma v. Williamson*, 347 P.2d 204, 207 (1959).

[18]Separating the words of the motto from context would require further inquiry into their meaning – which is not necessarily the meaning attributed to them by defendant; an unwarranted task in light of our view that they cannot be decontextualized.

[19]The profession of interpretation, which encompasses "communication activities designed to improve understanding" at historical, natural, and cultural sites, would also be impacted by such an injunction. *See generally,* The National Association for Interpretation, http://www.interpnet.com.

---

Other state officials, including the State Tax Commissioner, have used the seal and the words of the motto, or sometimes the words of the motto separately, on official forms and documents. Officials in several Ohio counties use the words of the motto on public documents. The motto also appears on the Franklin County Courthouse as well as on that county's seal and flag.

A pamphlet, *Ohio's Citizens Digest*, distributed by the Secretary of State lists, among other things, Ohio's symbols. Regarding the words of the motto, it says:

7. The State's Motto

In 1959, the Ohio legislature adopted the state's motto "With God all things are possible" (Matthew 19:26).

(JA at 306.)

A pamphlet, *Ohio: The Buckeye State*, distributed by The Ohio Historical Society reads in part:

STATE MOTTO

In 1866, a bill passed in the Ohio legislature specifying a motto to be incorporated into the Great Seal.

The motto, *Imerium in Imperio*, "an empire within an empire." But the motto was to be short-lived.

Great clamor arose over the pretentious feudal meaning of the Latin words, and in 1867, the law authorizing it was repealed. Ohio had no motto for the next 91 years.

In 1958, Jimmie Mastronardo, a sixth grade student in Cincinnati, became concerned that Ohio was the only state to have no motto. He found the perfect one in Matthew 19:26: "With God all things are possible." His classmates and interested friends helped him circulate a

petition to the legislature, and in 1959, the new motto was adopted.

(JA at 363.)

The State of Ohio web site, http://www.state.oh.us, s p e c i f i c a l l y   w e b   p a g e www.oplin.lib.oh.us/products/ohiodefined/ohd-9.html, exhibits the words of the motto as follows:

2.

While the mottos of other states use the word "God" in various combinations, Ohio's is the only state motto which quotes directly from either the Old Testament or the New Testament of the Christian Bible.

## C. Citizen Attitudes

The documentary evidence relating to citizen attitudes at trial was of two kinds. Defendants introduced into evidence numerous letters and petitions in support of placing the words of the motto in Capitol Square. Plaintiffs introduced into

## C. Reasons

### 1.

As we have established above, the district court could justify the secular cast of the words of the motto and remove them from the strictures of the Establishment Clause only by decontextualizing and blotting out their origins. In the context in which the words of the motto are found – as the words of Jesus speaking of salvation – to a reasonable observer, they must be seen as advancing, or at a minimum, showing a "particular affinity" for Christianity. Simply put, they are an endorsement of the Christian religion by the State of Ohio. No other interpretation in the context of their presence in the New Testament is possible.

We are satisfied that the words of the motto cannot be treated as they were by the district court. When Jesus spoke to his disciples he was explaining to them what was needed of them to enter heaven and achieve salvation, a uniquely Christian thought not shared by Jews and Moslems.[16]

We are also satisfied that the words of the motto, when considered by a reasonable observer, run afoul of the second prong of the *Lemon* test and they implicitly endorse Christianity, as prohibited by *Lynch supra*. They are at one with the stand alone creche in *Allegheny*, *supra*, and they do not partake of the various forms of ceremonial deisms as described in *Marsh supra,* and in the "In God We Trust" and Pledge of Allegiance cases. We see little difference in quoting Jesus' view on salvation, from a reference to him in prayer or his portrait on a school wall.[17]

---

[16] This would, of course, include those of the Bahai Faith, Buddhists, Hindus, Native Americans, and non-believers.

[17] We have come a long way from when it was acceptable that a Jewish man could be compelled to appear in court on his Sabbath day, *Simon's Executors v. Gratz*, XXIII Am. Dec. 35 (1831), or Justice Joseph

In *Deal v. United States*, 508 U.S. 129 (1993), Justice Scalia, writing for the Supreme Court, in interpreting the word "conviction" in 18 U.S.C. § 924(c)(1) said:

. . . [a] fundamental principle of statutory construction (and, indeed, of language itself) [is] that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.

508 U.S. at 132.

In *Smith v. United States*, 508 U.S. 223 (1993), the Supreme Court dealt with the meaning of the words "use of a firearm" in 18 U.S.C. § 924(c)(1). Justice O'Connor, writing for the Court, observed, "Language, of course, cannot be interpreted apart from context." 508 U.S. at 229. Justice Scalia, in his dissent, agreed with Justice O'Connor, repeating what he stated in *Deal*, *supra*. 508 U.S. at 241.

Lastly, in *Bailey v. United States*, 516 U.S. 137 (1995), again dealing with the meaning of the word "use" in 28 U.S.C. § 924(c)(1), Justice O'Connor writing for the Supreme Court said: "[T]he meaning of statutory language, plain or not, depends on context." 516 U.S. at 145.[15]

We believe that we are required to view the words of the motto as part of the text in which they are found and give to them, as reasonable observers, the meaning intended by Jesus when he addressed his disciples as reported by Matthew in the New Testament of the Christian Bible.

---

[15] An example of the ill result of decontextualizing a phrase is the perverse meaning given to the statement, "The first thing we do, let's kill all the lawyers," uttered by Dick the butcher in Shakespeare's *II Henry VI*, act. iv, scene 2. *See* Michael Franck *The First Thing We Do; Let's Kill All The Lawyers*, Mich. Bar J., Oct. 1981 at 725.

evidence the results of a survey measuring public awareness of community and country issues -- two questions of which were directed to the words of the motto. Ninety percent of those surveyed did not know of the words of the motto and, of the ten percent who were aware of the words of the motto, only a quarter of those were aware of its exact words.

### III. The Positions Of The Parties; The Court's Task

#### A. Plaintiffs

Plaintiffs' position is generally as follows.

The words of the motto or words of Jesus in the New Testament, to a reasonably well informed observer, violates the Establishment Clause of the First Amendment to the Constitution. The use of the words of the motto has no secular purpose, constitutes the advancement of the Christian religion, and entangles government in religious affairs. *See Lemon v. Kurtzman*, 403 U.S. 602, 612, 613 (1971).

The use of the words of the motto is not of long standing or a ubiquitous practice, as is prayer at the opening of a legislative session and, thus, the words of the motto have not become part of the fabric of our society. *See Marsh v. Chambers*, 463 U.S. 783 (1983).

The display of the words of Jesus in the New Testament as a motto also constitutes an endorsement of the Christian religion and is, therefore, unconstitutional under *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989).

### B. Defendants

Defendants' position is generally as follows.

#### 1.

The text and history of the Establishment Clause of the First Amendment, coupled with the Supreme Court's interpretations, allow for non-sectarian references to God in government symbols and practice. The State of Ohio has not adopted an "establishment of religion" simply by referring respectfully to God. The United States motto, "In God We Trust", on coins and currency, 36 U.S.C. § 302, the use of the words "under God" in the Pledge of Allegiance, 4 U.S.C. § 4, the approval of legislative prayer, and the support of military chaplains, *Marsh*, *supra*, are all examples of permitted, generalized, and respectful references to a higher power. That the words of the motto are drawn from the words of Jesus makes no difference. Standing apart from their original context in the New Testament, the words of the motto do not convey a message of endorsement of any one religion. Rather, the words of the motto inculcate hope and acknowledge the humility of Ohio's government and its leaders. The motto's generalized reference to God is entirely consistent with the text, the historic understanding, and the modern interpretation of the Establishment Clause. *See Chaudhuri v. Tennessee*, 130 F.3d 232 (6th Cir. 1997), *cert. denied,* 523 U.S. 1024 (1998).

#### 2.

Defendants argue that the generalized nature of the words of the motto allow a wide range of permissible readings and accommodate a wide range of views. They contend that the words of Jesus are not necessarily Christian and that the sacred text can be sanitized to eliminate its religious content.

Defendants do not take issue with, nor so much as mention, the injunctive limitations imposed by the district court as to forbidding mention of the origins of the words of the motto.

disciples when they heard Jesus say it to them. The State and district judge's meaning of Jesus' words is different than their meaning to a reader of the New Testament acquainted with its text, and is also certainly different than the meaning a lectionary would ascribe to them when it suggests they be read as the text on a particular Sunday.

Lastly, the meaning of the words of the motto is certainly different than the meaning that would be ascribed to them by persons engaged in biblical discourse or debating a point of scripture.

#### 2.

The Supreme Court, more than once, has dealt with efforts to read words or phrases out of context. The predicate ruling for these efforts is Judge Learned Hand's observation in *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) that:

> Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part.

In *Moskal v. United States*, 498 U.S. 103 (1990), the question was the meaning of the words "false made" in an anti-counterfeiting statute. Justice Marshall, writing for the Supreme Court, observed that "the meaning of language is inherently contextual," 498 U.S. at 108. Justice Scalia, in his dissent, quoted Justice Felix Frankfurter saying:

> . . . as Justice Frankfurter more poetically put it: "[I]f a word is obviously transplanted from another legal source, whether common law or other legislation, it brings its soil with it."

498 U.S. at 121 (citations omitted).

robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee. A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.

319 U.S. at 632-33.

It is equally so with a state motto. The words of a motto are a form of symbolic speech whether vocalized or read and, therefore, take their meaning from the text in which they are located, as we shall describe.

## B. Decontextualization

### 1.

Defendants, at oral argument, defined the meaning of the words of the motto as follows:

[they] endor[se] the notion that Ohio has a bright future, that their citizens do, that people ought to be optimistic and hopeful about the future.

This meaning is consistent with the meaning the district court found in the words of the motto. *See supra* Part I.D. This meaning, of course, can be justified only if the words are removed from the context in which they are found – and were found by the Cincinnati schoolboy when he first suggested they stand as the State of Ohio's official motto. *See supra* Part I.E.

The meaning argued by the State, and accepted by the district court, is significantly different than the meaning intended by Jesus when, as reported by Matthew, he spoke to his disciples, and certainly different than the meaning to the

### C. The Court's Task

Our task is to resolve these conflicting views in light of applicable precedent and with an understanding of the significance of the words of the motto. In this connection, some understanding of the use of mottos generally in public life is an important consideration to our decision. We shall first discuss the precedents as we understand them, and then go on to discuss the use of mottos generally as well as the significance of the words of the motto. After that, we shall explain the reasons for the result in this case.

## IV.  The Precedents

### A. Preliminary

In looking at the precedents underlying our decision, "[C]andor compels acknowledgment . . . that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon*, 403 U.S. at 612. We believe that our job is to cull from the plethora of cases constituting Establishment Clause jurisprudence those which best lead to a proper decision.[7]

In our discussion of the precedents, we shall confine ourselves to the essential holding of the several cases which we believe best lead to a proper decision. In doing so, we will not explicate on the variety of concurring and dissenting opinions displayed in each of these cases except where absolutely necessary to understand the holding of a particular decision. It is our intention to demonstrate an understanding

---

[7]One commentator has referred to the Supreme Court's religious freedom decisions as a "bewildering array." *See* Catharine Cookson, *Foundation of Church State Relations*, Focus on Law Studies Vol. XV, No. 1, p. 8 (Div. for Public Educ. of the Am. Bar Ass'n). See also Robert A. Sedler, *Understanding the Establishment Clause: The Perspective of Constitutional Litigation*, 43 Wayne L. Rev. 1317 (1997) for a comprehensive review of the Supreme Court decisions in this area.

of, and appreciation for, the precedents which determine our decision.

These cases allow us to set the base line which divides the acceptable from the unacceptable in government activity, recognizing that government may not intrude into activity which is essentially religious, and therefore confined to private action, as compared to secular activity which may have a religious cast, but is action with which the government may cooperate.

### B.  Supreme Court Precedents

The first of the modern Establishment Clause cases is *Everson v. Board of Education*, 330 U.S. 1 (1947) (use of tax money as part of a general program to provide transportation for public and parochial students does not violate the Establishment Clause).  There, the Supreme Court said:

The "establishment of religion" clause of the First Amendment means at least this: neither a state nor the Federal Government can set up a church.  Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.  Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.  No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.  No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to each or practice religion.  Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.  In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

. . . .

. . . Although the origin of mottoes is somewhat murky, their present role is well defined.  They are most usefully thought of as rousing and inspirational rallying cries.  In fact it is as battle cries that mottoes and slogans got their start, and they continue to serve very effectively in that capacity.

In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Supreme Court had occasion to  discuss the meaning of a motto when it considered the State of New Hampshire's requirement that non-commercial vehicles bear license plates embossed with the state motto "Live Free or Die."  The Supreme Court defined the issue as follows:

We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an *ideological message* by displaying it . . .

430 U.S. at 713.

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court reversed its position in *Minnersville School District v. Gobitis*, 310 U.S. 586 (1940), and held that it was unconstitutional to compel school children to participate in a compulsory flag salute and pledge of allegiance ceremony.  In commenting on the significance of these activities as symbolic speech, the Supreme Court said:

Symbolism is a primitive but effective way of communicating ideas.  The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind.  Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design.  The State announces rank, function, and authority through crowns and maces, uniforms and black

of religion.  We need not drain the meaning from the reference to reach this conclusion.

980 F.2d at 448 (internal citations omitted).

## VI. Analysis

Before applying the precedents we have discussed to the words of the motto directly, we believe it important to have an understanding of the meaning and significance of mottos generally, as well as the defendants' (and the district court's) efforts to decontextualize the words of the motto to achieve a secular meaning and, therefore, pass Establishment Clause muster.

### A. Mottos

A "motto", as defined in Webster's Third New International Dictionary (1986), is a short suggestive expression of a guiding principle."

The American Heritage Dictionary of the English Language 1180 (3d ed. 1992) contains two definitions for motto:  (1) "A brief statement used to express a principle, a goal, or an ideal" or (2) "a maxim as a guide to one's conduct."

Brian Burrell, in *The Words We Live By*: *The Creeds, Mottoes, and Pledges that Have Shaped America, 158-59* (The Free Press 1997), discusses mottos as follows:

. . . the practice of adopting brief sentiments or maxims as something to go by is widespread.  In the corporate sphere, in academia, in associations and clubs, in the military, and in the public forum, mottoes help people to set their bearings.  While only a small percentage of people actively espouse mottoes, the majority are quick to defend them, and are generally pleased to have them.

This is because mottoes and slogans are the most succinct ready-made opinions . . . .

330 U.S. at 15-16 (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878).

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971) (school financing program for non-public schools involved excessive government entanglement and therefore violated Establishment Clause) the Supreme Court synthesized its jurisprudence since *Everson*, and enunciated what has come to be known as the *Lemon* test:

Every analysis in this area must begin with consideration of the administrative criteria developed by the Court over many years.  Three such tests may be gleaned from our cases.  First, the statute must have a secular legislative purpose; second, its principle or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster "an excessive entanglement with religion."

403 U.S. at 612 (internal citations omitted).  The Supreme Court observed that:

Judicial caveats against entanglement must recognize that the line of separation, far from being a "wall," is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

403 U.S. at 614.

In 1984, in *Lynch v. Donnelly*, 465 U.S. 668 (1984)(creche as part of municipal Christmas display acceptable under Establishment Clause), Justice O'Connor,[8] in a concurring

---

[8] Justice O'Connor's views in this area of Constitutional law (as well as other areas in which the Supreme Court appear to be divided into two camps) are considered  important beyond those of any of the other justices.  *See* Lisa Langendorfer, *Establishing a Pattern: An Analysis of the Supreme Court's Establishment Clause Jurisprudence*, 33 U. Rich. L. Rev. 705 (1999).

opinion, gave a new gloss to the *Lemon* test with what has come to be known as the endorsement test when she said:

The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is excessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to government or governmental powers not fully shared by nonadherents of the religion, and foster the creation of political constituencies defined along religious lines. The second and more direct infringement is government endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.

465 U.S. at 687-88 (internal citations omitted). Justice O'Connor went on to explain:

The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. *The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.* An affirmative answer to either question should render the challenged practice invalid.

465 U.S. at 690 (emphasis added).

In 1985, in *Wallace v. Jaffree*, 472 U.S. 38 (1985) (statute authorizing one minute of silent school prayer held unconstitutional), a plurality of the Supreme Court approved the endorsement test when it said: "In applying the purpose test, it is appropriate to ask 'Whether government's actual purpose is to endorse or disapprove religion.'" *Id.* at 56

further acknowledge the dependence of our people and our Government upon the moral directions of the Creator. At the same time it would serve to deny the atheistic and materialistic concepts of communism with its attendant subservience of the individual.

It goes on to say:

It should be pointed out that the adoption of this legislation in no way runs contrary to the provisions of the first amendment to the Constitution. This is not an act establishing a religion or one interfering with the "free exercise" of religion. A distinction must be made between the existence of a religion as an institution and a belief in the sovereignty of God. The phrase "under God" recognizes only the guidance of God in our national affairs. The Supreme Court has clearly indicated that the references to the Almighty which run through our laws, our public rituals, and our ceremonies in no way flout the provisions of the first amendment.

H.R. No. 83-1693, 1954 U.S.C.C.A. 2339.

In *Sherman v. Community Consolidated School District 21 of Wheeling Township*, 980 F.2d 437 (7th Cir. 1992), the Court of Appeals for the Seventh Circuit, setting aside the voluntary nature of the exercise, turned back a challenge to the pledge of allegiance by the father of a minor child that the inclusion of the reference to God was a violation of the Establishment Clause. The essence of the Seventh Circuit decision is best expressed in the concurring opinion which says:

The Pledge of Allegiance with all of its intended meaning does not effectuate an establishment of religion. If legislative prayer based upon the Judeo-Christian tradition is permissible . . ., and a Christmas nativity scene erected by a city government is permissible . . ., then certainly the less specific reference to God in the Pledge of Allegiance cannot amount to an establishment

. . . .

We need not engage in such empirical investigation because "we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the State] endorses religion." "[T]he endorsement inquiry is not about the perceptions of particular individuals or saving isolated non-adherents from the discomfort of viewing symbols of faith to which they do not subscribe." It is instead an objective inquiry that this court is fully equipped to conduct with the facts at hand. After making that inquiry, we find that a reasonable observer, aware of the purpose, context, and history of the phrase "In God we trust," would not consider its use or its reproduction on U.S. currency to be an endorsement of religion.

74 F.3d at 217 (internal citations omitted).

### 2. The Pledge Of Allegiance

The Pledge of Allegiance was initially given official recognition in June 1942 by a joint resolution of Congress. It was amended to include the words "one nation under God" by a joint resolution approved June 14, 1954. 68 Stat. 249. The legislative history of the joint resolution, while skirting close to giving an impermissible religious cast to the inclusion, states:

At this moment of our history the principles underlying our American Government and the American way of life are under attack by a system whose philosophy is at direct odds with our own. Our American Government is founded on the concept of the individuality and the dignity of the human being. Underlying this concept is the belief that the human person is important because he was created by God and endowed by him with certain inalienable rights which no civil authority may usurp. The inclusion of God in our pledge therefore would

---

(quoting *Lynch* at 690). In her concurring opinion, Justice O'Connor refined the endorsement test, saying:

The endorsement test does not preclude government from acknowledging religion or from taking religion into account in making law and policy. It does preclude government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred. Such an endorsement infringes the religious liberty of the nonadherent, for "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." At issue today is whether state moment of silence statutes in general, and Alabama's moment of silence statute in particular, embody an impermissible endorsement of prayer in public schools.

472 U.S. at 70 (internal citations omitted). Also in *Wallace*, Justice O'Connor first articulated what has come to be known as the reasonable observer test when she said:

The relevant issue is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it is a state endorsement . . . .

476 U.S. at 76.

Finally, in *School District of Grand Rapids v. Ball*, 473 U.S. 373 (1985) (shared and released time school programs violates Establishment Clause), the Supreme Court brought Justice O'Connor's clarifications together when it said:

It follows that an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the

nonadherents as a disapproval, of their individual religious choices.

473 U.S. at 390.

### C. Reasonable Observer

As to the reasonable observer, Justice O'Connor clarified the definition in her concurring opinion, with two other justices joining, in *Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753 (1995) (State of Ohio did not violate Establishment Clause in allowing the Ku Klux Klan to display crosses in Capitol Square[9] during Christmas season) stating:

I therefore disagree that the endorsement test should focus on the actual perception of individual observers, who naturally have differing degrees of knowledge. Under such an approach, a religious display is necessarily precluded so long as some passersby would perceive a governmental endorsement thereof. In my view, however, the endorsement test creates a more collective standard to gauge "the 'objective' meaning of the [government's] statement in the community." In this respect, the applicable observer is similar to the "reasonable person" in tort law, who "is not to be identified with any ordinary individual, who might occasionally do unreasonable things," but is "rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment." Thus, "we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person might think [the State] endorses religion." Saying that the endorsement inquiry should be conducted from the perspective of a

---

[9] This is the same square in which the state has installed the great seal with the words of the motto. *See supra* Part I.C.

It will be of great spiritual and psychological value to our country to have a clearly designated national motto of inspirational quality in plain, popularly accepted English.

H.R. No. 84-1959, 1956 U.S.C.C.A. 3720.

In *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970), the Court of Appeals for the Ninth Circuit declined to order a three-judge court, convened under 28 U.S.C. § 2286, to consider a challenge to the national motto on the grounds that:

It is quite obvious that the national motto and the slogan on coinage and currency "In God We Trust" has nothing whatsoever to do with the establishment of religion. Its use is of a patriotic or ceremonial character and bears no true resemblance to a governmental sponsorship of a religious exercise.

432 F.2d at 243. The Ninth Circuit went on to say:

While "ceremonial" and "patriotic" may not be particularly apt words to describe the category of the national motto, it is excluded from First Amendment significance because the motto has no theological or ritualistic impact. As stated by the Congressional report, it has "spiritual and psychological value" and "inspirational quality."

432 F.2d at 243-44 (internal footnotes omitted).

In *Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996), the Court of Appeals for the Tenth Circuit found a challenge to the national motto under the Establishment Clause without merit, stating:

The reasonable observer, much like the reasonable person of tort law, is the embodiment of a collective standard and is thus "deemed aware of the history and context of the community and forum in which the religious display appears."

discrimination does not immunize such practices from scrutiny under the Fourteenth Amendment.

492 U.S. at 630 (internal citations omitted and emphasis added).

### B. In God We Trust And The Pledge Of Allegiance

The Supreme Court, while justifying inclusion of God in the Pledge of Allegiance and "In God We Trust," an adaptation of text found in *Psalms*, as our national motto, has not yet decided a direct challenge to these practices. However, the courts of appeals have dealt with both the national motto and the pledge of allegiance. Legislative prayer as constitutional has already been discussed. *See supra* Part III.D.2.

### 1.

The national motto, "In God We Trust," was enacted into law in 1956. *See* 70 Stat. 732, P.L. 851, 1956. After describing the history of its use in coinage, beginning with the Act of March 3, 1865 (13 Stat. 518), and the adoption of the Star Spangled Banner[13] as our national anthem (and particularly its fourth stanza),[14] the legislative history regarding our national motto reads:

---

[13]The Star Spangled Banner was designated as our National Anthem in 1931. *See* 46 Stat. 1508; 36 U.S.C. § 170.

[14]The fourth stanza of the Star Spangled Banner is as follows:

'O, thus be it ever when freemen shall stand
Between their lov'd home and the war's desolation.
Blest with vict'ry and peace may the heav'n rescued land
Praise the power that hath made and preserved us a nation.
Then conquer we must when our cause it is just,
And this be our motto – 'In God is our trust.'
And the Star-Spangled Banner in triumph shall wave
O'er the land of the free and the home of the brave.'

---

hypothetical observer who is presumed to possess a certain level of information that all citizens might not share neither chooses the perceptions of the majority over those of a "reasonable non-adherent," nor invites disregard for the values the Establishment Clause was intended to protect. It simply recognizes the fundamental difficulty inherent in focusing on actual people: There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion. A State has not made religion relevant to standing in the political community simply because a particular viewer of a display might feel uncomfortable.

515 U.S. at 779-80 (internal citations omitted).

### D. The *Lemon* Test

### 1.

We shall not discuss either the purpose or entanglement prongs of the *Lemon* test. Illustrative of a state statute held unconstitutional under the purpose prong is *Edwards v. Aguillard*, 482 U.S. 578 (1987) (mandatory teaching of evolution violates Establishment Clause).[10] Illustrative of a

---

[10]Also illustrative of the application of the purpose prong is the Supreme Court's decision in *Stone v. Graham*, 449 U.S. 39 (1980) (holding unconstitutional a Kentucky statute requiring the posting of the Ten Commandments, purchased with private contributions, on the wall of each public school as having no secular legislative purpose). Ten Commandments jurisprudence will likely be revisited one day by the Supreme Court given the efforts of lower courts to work around this decision, and the contentiousness of the issue within communities. *See Suhres v. Board of Comm's,* 894 F. Supp. 927 (W.D. N.C. 1995), 55 F. Supp. 2d 834 (W.D. N.C. 1999); *Alabama Freethought Assn. v. Moore*, 893 F. Supp. 1522 (N.D. Ala. 1995). *But see Harvey v. Cobb County, Georgia*, 811 F. Supp. 669 (N.D. Ga. 1993), *aff'd* 15 F.3d 1097 (11th Cir. 1994). *See also* Marc D. Stern, American Jewish Congress, Comm'n on Law and Social Action, *The Ten Commandments: Innocent Display or Weapons in a Religious War*, Sept. 1999.

state statute held unconstitutional under the excessive entanglement clause is *Lemon, supra* (state program supplementing the salaries of parochial school teacher of secular subjects violates Establishment Clause).

### 2.

Three cases in which the Supreme Court considered the effects prong of *Lemon* focus the rule for our purposes. These are: *Marsh v. Chambers*, 463 U.S. 783 (1983) (opening legislative session with prayer does not violate Establishment Clause), *Lynch v. Donnelly*, 465 U.S. 668 (1984) (creche as part of Christmas display does not violation Establishment Clause), and *Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989) (stand-alone creche on stairs of public building violates Establishment Clause; Hanukkah menorah as part of Christmas display does not violate Establishment Clause).

In *Marsh,* the Supreme Court observed that:

The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom. In the very courtrooms in which the United States District Judge and later three Circuit Judges heard and decided this case, the proceedings opened with an announcement that concluded, "God save

---

Of particular interest to our decision is the fact that the Supreme Court in *Stone* declined to accept the argument that the Ten Commandments can be removed from their biblical setting and simply be considered as the "basic tenets of a particular scheme of Western philosophical thought," as said by one of the justices of the Kentucky Supreme Court which split equally on the lower court decision finding their posting constitutional. *See Stone v. Graham*, 599 S.W.2d 157, 158 (Ky. 1980); *see also, Harvey v. Cobb County*, *supra*.

465 U.S. at 716 (internal citations and footnote omitted).

In *Allegheny*, *supra*, Justice Blackmun, in a footnote to his majority opinion, in explaining legislative prayer as constitutional in *Marsh,* said:

The function and history of this form of *ceremonial deism* suggest that "those practices are not understood as conveying government approval of particular religious beliefs."

492 U.S. at 595-96 n. 46 (quoting *Lynch* at 717) (emphasis added). Justice Blackmun again used the term in distinguishing creche displays, references to God in the motto, and in the pledge of allegiance. *See* 492 U.S. at 603.

Justice O'Connor, in her concurring opinion in *Allegheny*, explained ceremonial deism as follows:

Justice Kennedy submits that the endorsement test is inconsistent with our precedents and traditions because, in his words, if it were "applied without artificial exceptions for historical practice," it would invalidate many traditional practices recognizing the role of religion in our society." This criticism shortchanges both the endorsement test itself and my explanation of the reason why certain long standing government acknowledgments of religion do not, under that test, convey a message of endorsement. Practices such as legislative prayers or opening Court sessions with "God save the United States and this honorable Court" serve the secular purposes of "solemnizing public occasions" and "expressing confidence in the future" These examples of *ceremonial deism* do not survive Establishment Clause scrutiny simply by virtue of their historical longevity alone. Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause, just as historical acceptance of racial or gender based

with legislative sessions.  These practices have come to be discussed under the rubric "ceremonial deisms," a term first found in the literature in a reference to the 1962 Meiklejohn Lecture at Brown University given by Dean Eugene Rostow of Yale University Law School.[12]  Regrettably, the reference is in a book review by Professor Arthur E. Sutherland of Harvard University Law School and then only in a footnote. *See* Sutherland Book Review, 40 Ind. L.J. 83, 86 n. 7 (1965). Professor Sutherland said:

> . . . constitutional tolerance of the opening prayers in the Congress would require some other theory – possibly the idea that another class of public activity, which the Dean of the Yale Law School recently called "ceremonial deism," can be accepted as so conventional and uncontroversial as to be constitutional.

*Id.* at 86 (quoting Dean Rostow from memory).

Justice Brennan, in his dissenting opinion in *Lynch*, *supra*, brought the phrase into Supreme Court jurisprudence when he said:

> Finally, we have noted that government cannot be completely prohibited from recognizing in its public actions the religious beliefs and practices of the American people as an aspect of our national history and culture.  While I remain uncertain about these questions, I would suggest that such practices as the designation of "In God We Trust" as our national motto, or the references to God contained in the Pledge of Allegiance to the flag can best be understood, in Dean Rostow's apt phrase, as a form of "ceremonial deism," protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content.

---

[12]*See also*, *Rostow, Sutherland Investigate 'Religion and First Amendment*,' Brown Daily Herald, May 4, 1964, at 1,4.

the United States and this Honorable Court."  The same invocation occurs at all sessions of this Court.

463 U.S. at 786.  It then went on to find the practice constitutional stating:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society.  To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

463 U.S. at 792.

In *Lynch*, the Supreme Court, in finding the display of a creche as part of a business district Christmas display compatible with the Establishment Clause, said that "[w]e are unable to discern a greater aid to religion deriving from inclusion of the creche than from those benefits and endorsements previously held not violative of the Establishment Clause."  465 U.S. at 682.

*Allegheny*, with its bifurcated holding, is particularly instructional.  The creche scene stood on the grand staircase of a courthouse alone and included as part of the display words of the New Testament "Gloria in Excelcis Deo" ("Glory to God in the Highest").  The Supreme Court said:

> . . . the creche sits on the Grand Staircase, the "main" and "most beautiful part" of the building that is the seat of county government.  No viewer could reasonably think that it occupies this location without the support and approval of the government.  Thus, by permitting the "display of the creche in this particular physical setting" the county sends an unmistakable message that it

supports and promotes the Christian praise to God that is the creche's religious message.

492 U.S. at 599-600 (footnotes and internal citations omitted).

The menorah, however, was part of an annual Christmas display outside a city-county building and stood next to a Christmas tree. In finding that it passed constitutional muster the Supreme Court said:

> . . . it is not "sufficiently likely" that residents of Pittsburgh will perceive the combined display of the tree, the sign, and the menorah as an "endorsement" or "disapproval . . . of their individual religious choices." While an adjudication of the display's effect must taken into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to either of these religions, ibid., the constitutionality of its effect must also be judged according to the standard of a "reasonable observer." . . . When measured against this standard, the menorah need not be excluded from this particular display. The Christmas tree alone in the Pittsburgh location does not endorse Christian belief; and, on the facts before us, the addition of the menorah "cannot fairly be understood to" result in the simultaneous endorsement of Christian and Jewish faiths. On the contrary, for purposes of the Establishment Clause, the city's overall display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season.

492 U.S. at 620 (footnotes and internal citations omitted).

In *Stein v. Plainwell Community Schools*, 822 F.2d 1406, 1410 (6th Cir. 1987), we dealt with the practice of the delivery of invocation and benedictions at public high school commencement ceremonies, holding invalid those that "are framed and phrased so that they 'symbolically place the government's seal of approval on one religious view'-- the Christian view," (citing *Marsh v. Chambers, supra* at 792.)

In *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679 (6th Cir. 1994), we held unconstitutional the placing of a portrait of Jesus in the hallway of a public school. In so doing we rejected the argument that the picture has meaning to all religions and that it is not inherently a symbol of Christianity. On the authority of *Lemon, supra*, and *Marsh, supra,* we said:

> But Christ is central only to Christianity, and his portrait has a proselytizing, affirming effect that some non-believers find deeply offensive. Though the portrait, like school prayers and other sectarian religious rituals and symbols, may seem "de minimis" to the great majority, particularly those raised in the Christian faith and those who do not care about religion, a few see it as a governmental statement favoring one religious group and downplaying others. It is the rights of these few that the Establishment Clause protects in this case.

33 F.3d at 684.

## V. Ceremonial Deism[11]

### A. Preliminary

Practices closer to home which now require discussion are our national motto, "In God We Trust," the inclusion of God into the pledge of allegiance, and again, prayer in conjunction

---

[11] *See generally,* Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 Colum. L. Rev. 2083 (1996).

test of *Lemon* and found each of its criteria: secular purpose, primary effect, and entanglement, were present.  We said:

> Moreover, the content of the prayers delivered at the school board meetings clearly went beyond what was necessary to solemnize or bring a more businesslike decorum to such meetings.  The prayers frequently called for divine assistance or affirmation, sometimes by using veiled references to the Bible.  In addition, many prayers mentioned Jesus by name.  The board could have used the inspirational words of Abraham Lincoln or, as in fact one speaker did, the speeches of Dr. Martin Luther King, Jr. to achieve the same ends.  Instead, the board relied upon the intrinsically religious practice of prayer to achieve its stated secular end.

171 F.3d at 384.  We concluded:

> . . . we do not mean to imply that religion must be kept entirely out of the public school system.  Certainly students might themselves wish to pray during the time they spend at school.  It is only when the government, through its school officials, chooses to introduce and exhort religion in the school system that Establishment Clause concerns take shape.  That is what has happened in the present case, with the school board's involvement in promoting prayer crossing the line of constitutional infirmity.

171 F.3d at 385-86.

### 2.

We also have had occasion to deal with situations in which public schools incorporated either a reference to Jesus, or the person of Jesus particularly, into a school activity.  Because of the clearly sectarian nature of what was done, we have found a violation of the Establishment Clause.

### E. Sixth Circuit Precedents

### 1.

As we read the Establishment Clause jurisprudence of this circuit we find consistency with what we have said above.

In *American Civil Liberties Union of Kentucky v. Wilkins*, 895 F.2d 1098 (6th Cir. 1990) and *Doe v. City of Clawson*, 915 F.2d 244 (6th Cir. 1990), we found nativity scenes not offensive to the Establishment Clause because the settings in which they were displayed were much like the setting of the Menorah in *Allegheny*, *supra*, i.e., part of a Christmas display.  In *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992), sitting *en banc*, we held that a menorah display erected during the Hanukkah season in a traditional public forum did not violate the Establishment Clause because it could not be seen as an endorsement of religion by a reasonable observer.  The decision followed and explicated on Justice O'Connor's definition of a reasonable observer:

> In attempting to define the "reasonable observer," we must look to the guidelines established by precedents both from this court and the Supreme Court.  Justice O'Connor, who first promulgated the endorsement test, has emphasized that, when adopting the perspective of the reasonable observer, courts must consider *all* of the facts presented in each case.  "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion."  She repeated this warning in *Allegheny*, noting that "the endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice . . . ."

> However, Justice O'Connor has also recognized that when a court analyzes a religious display, some facts should receive greater consideration than others.  For example, certain religious practices that might otherwise

be unconstitutional are valid if their "history and ubiquity" would convince a reasonable observer that such practices merely represent an "acknowledgment" of religion. Thus, because of their "history and ubiquity," Justice O'Connor approved the constitutionality of legislative prayers such as those in *Marsh v. Chambers*. She has also stated that the Establishment Clause permits "government declaration of Thanksgiving as a public holiday, printing of 'In God We Trust' on coins, and opening court sessions with 'God save the United States and this honorable court.'" She repeated this reasoning in *Allegheny*:

> It is the combination of the longstanding existence of practices such as opening legislative sessions with legislative prayers..., as well as their *nonsectarian nature*, that lead me to the conclusion that those particular practices, despite their religious roots, do not convey a message of endorsement of particular religious beliefs.

980 F.2d at 1544 (internal citations omitted).

In *Chaudhuri v. State of Tennessee*, 130 F.3d 232 (6th Cir. 1997), a college professor who followed the Hindu religion did not prevail on his challenge to a moment of silence, or prayer, at university functions because of the non-sectarian nature of the occurrence. There we said:

> Any prayer has a religious component, obviously, but a single-minded focus on the religious aspects of challenged activities – which activities, in an Establishment Clause case, are religiously-oriented by definition – would extirpate from public ceremonies all vestiges of the religious acknowledgments that have been customary at civic affairs in this country since well before the founding of the Republic. The Establishment Clause does not require – and our constitutional tradition does not permit – such hostility toward religion. The

people of the United States did not adopt the Bill of Rights in order strip the public square of every last shred of public piety.

> Rejecting the label "nonsectarian," Dr. Chaudhuri and *amicus curiae* (the National Committee for Public Education and Religious Liberty) persist in labeling the prayers in question as "Christian." The plaintiff and the Committee imply that TSU's purpose in allowing the prayers was to advance the cause of Christianity. But these prayers, lacking any explicit or implicit reference to Jesus Christ, do not strike us as overtly Christian.

130 F.3d at 236 (internal citations omitted).

In *Hawle v. City of Cleveland*, 24 F.3d 814, (6th Cir. 1994), we found that the lease of airport space for a chapel did not violate the Establishment Clause because:

> . . . the chapel serves the secular purpose of accommodating the religious needs of travelers [sic] and providing them with a place for rest and comfort. Moreover, because a reasonable observer would not conclude that the city endorses religion by allowing the diocese to maintain the chapel, the chapel's lease and its authorizing ordinance do not constitute an endorsement of religion, and thus their primary effect is one that neither advances nor inhibits religion. We find, finally, that the chapel's lease and its authorizing ordinance also do not foster an excessive government entanglement with religion.

24 F.3d at 822.

Lastly, in our most recent exposition on the Establishment Clause, *Coles v. Cleveland Board of Education*, 171 F.3d 369 (6th Cir. 1999), we found that the Cleveland Board of Education's practice of opening each meeting with a prayer violated the Establishment Clause. In coming to this conclusion, we analyzed the practice under the three prong